S09A1367. FAVORITO et al. v. HANDEL et al.

(684 SE2d 257)

CARLEY, Presiding Justice.

After a Pilot Project was conducted in 2001 pursuant to Ga. L. 2001, pp. 269, 285, § 19, the General Assembly established a uniform direct recording electronic (DRE) voting system. Ga. L. 2002, p. 598. See also Ga. L. 2003, p. 517. The Secretary of State examined, purchased, and distributed touch-screen voting machines, testing them at various points during the process. In 2006, several Georgia residents (Appellants) filed a multi-count complaint for declaratory judgment, injunction, and mandamus against the Secretary of State, the Governor of Georgia, and the Georgia State Election Board (Appellees), challenging the authorization and use of the DRE equipment. On cross-motions for summary judgment, the trial court entered an extensive order granting Appellees' motion in its entirety. Appellants appeal from that order.

1. In three counts of their complaint, Appellants allege that this

state's use of the DRE equipment denies them equal protection under the Federal and State Constitutions and the fundamental right to vote under the due process clause of the Fourteenth Amendment. Appellants contend that the trial court erred by failing to recognize that voting is a fundamental right and improperly applying a "rational basis" test instead of a "strict scrutiny" test to those three counts. Unless governmental action infringes upon a fundamental right or the complaining party is a member of a suspect class, a substantive due process or equal protection challenge is examined under the "rational basis" test. *Georgia Dept. of Human Resources v. Sweat*, 276 Ga. 627, 628 (2), 630 (3) (580 SE2d 206) (2003).

(a) "The right to vote is fundamental, forming the bedrock of our democracy. [Cits.]" *Wexler v. Anderson*, 452 F3d 1226, 1232 (III) (11th Cir. 2006). "However, it is also clear that states are entitled to broad leeway in enacting reasonable, even-handed legislation to ensure that elections are carried out in a fair and orderly manner. [Cits.]" *Weber v. Shelley*, 347 F3d 1101, 1105 (II) (B) (9th Cir. 2003).

> The Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, and the [Supreme] Court [of the United States] therefore has recognized that States retain the power to regulate their own elections. [Cits.] . . . Election laws will invariably impose some burden upon individual voters . . . . Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently. . . . [A] more flexible standard applies . . . . Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, . . . when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." [Cit.] But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. [Cits.]

*Burdick v. Takushi*, 504 U. S. 428, 433-434 (II) (112 SC 2059, 119 LE2d 245) (1992).

Appellants argue that their fundamental right to vote is currently being injured because the recording, counting, and retention of their votes, unlike paper ballots, are not being properly protected either by an independent audit trail or by county and state tabulators which can prevent fraudulent manipulation.

Under *Burdick*, the use of touchscreen voting systems is not subject to strict scrutiny simply because this particular balloting system may make the possibility of some kinds of fraud more difficult to detect. [Cit.] Rather, the question is whether using a system that brings about numerous positive changes . . . , but lacks a voter-verified paper ballot, constitutes a "severe" restriction on the right to vote. We cannot say that use of paperless, touchscreen voting systems severely restricts the right to vote. No balloting system is perfect. Traditional paper ballots, as became evident during the 2000 presidential election, are prone to overvotes, undervotes, "hanging chads," and other mechanical and human errors that may thwart voter intent. [Cit.] Meanwhile, touchscreen voting systems remedy a number of these problems, albeit at the hypothetical price of vulnerability to [certain types of fraud]. The [DRE Voting] System does not leave [Georgia] voters without any protection from fraud, or any means of verifying votes, or any way to audit or recount. The unfortunate reality is that the possibility of electoral fraud can never be completely eliminated, no matter which type of ballot is used. [Cit.] [Even assuming that] none of the advantages of touch-screen systems over traditional methods would be sacrificed if voter-verified paper ballots were added to touchscreen systems . . . , it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems. [Cits.] So long as their choice is reasonable and neutral, it is free from judicial second-guessing. In this instance, [Georgia] made a reasonable, politically neutral and non-discriminatory choice to certify touchscreen systems as an alternative to paper ballots. . . . Nothing in the Constitution forbids this choice. (Emphasis omitted.)

*Weber v. Shelley*, supra at 1106-1107 (II) (B). See also *Mills v. Shelby County Election Comm.*, 218 SW3d 33, 41-42 (Tenn. App. 2006).

(b) "Because the protection provided in the Equal Protection Clause of the United States Constitution is coextensive with that provided in Art. I, Sec. I, Par. II of the Georgia Constitution of 1983, we apply them as one. [Cits.]" *Nodvin v. State Bar of Ga.*, 273 Ga.

559-560 (2) (544 SE2d 142) (2001). See also *Grissom v. Gleason*, 262 Ga. 374, 376 (2) (418 SE2d 27) (1992). "Under the equal protection clauses of the United States and Georgia Constitutions, the government is required to treat 'similarly situated individuals in a similar manner.' " *Nichols v. Gross*, 282 Ga. 811, 812 (653 SE2d 747) (2007).

Appellants argue that electronic voters are treated differently from those voters who cast absentee ballots on paper, as the procedures for and accuracy of any recount would differ. As the trial court found, however, Appellants and all other Georgia voters "have the option of casting an absentee ballot or using the touch screen electronic voting machines on election day. Under Georgia law, every eligible voter in Georgia can make a decision to vote utilizing absentee ballots." See OCGA § 21-2-380 (b). Appellants argue that this option ends the week prior to an election day. However, in deciding to forego the privilege of voting early on a paper ballot, voters assume the risk of necessarily different procedures if a recount is required. Therefore, absentee voters "have not been treated differently from the polling place voters, except in a manner permissible under the election statutes" and as a result of their own choice. *State v. Cahill*, 575 SW2d 229, 235 (Mo. App. 1978). The trial court correctly concluded that, since "every Georgia citizen could vote either by absentee ballot or by utilizing the touch screen voting system . . . , [Appellants'] contention that there is some State based classification between voters is false." "We cannot see how Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other." *Jenness v. Fortson*, 403 U. S. 431, 440-441 (91 SC 1970, 29 LE2d 554) (1971) (involving alternatives available to an aspiring candidate of either entering the primary of a political party or circulating nominating petitions).

Even assuming that such a classification of persons is involved, there clearly is no suspect class and, unless a fundamental right is being infringed, Appellants, as the parties "challenging the classification, [have] the responsibility of convincing the court that the classification has no rational basis. [Cit.]" *State of Ga. v. Heretic, Inc.*, 277 Ga. 275, 276 (1) (588 SE2d 224) (2003). If touchscreen voters

> are burdened at all, that burden is the mere possibility that . . . [their] ballots will receive a different, and allegedly inferior, type of review in the event of a . . . recount. Such a burden, borne of a reasonable, nondiscriminatory regulation, is not so substantial that strict scrutiny is appropriate. [Cits.] Thus, we review [Georgia's] . . . recount procedures

to determine if they are justified by the State's "important regulatory interests." [Cit.] . . . [There are] important reasons for employing different . . . recount procedures according to the type of voting system. . . . The differences between these procedures are necessary given the differences in the technologies themselves and the types of errors voters are likely to make in utilizing those technologies. . . . [Unlike a voter using an absentee paper ballot, a touchscreen voter] either chooses a candidate for a particular race or does not; the touchscreen machines do not record ambiguous indicia of voter intent that can later be reviewed during a . . . recount. . . . Accordingly, we hold that [Georgia's] recount procedures are justified by the State's important regulatory interests and, therefore, they do not violate equal protection. [Cit.]

*Wexler v. Anderson*, supra at 1232-1233 (III).

2. Appellants further contend that OCGA § 21-2-280, by exempting electronic voting from the requirement that elections be conducted by ballot, violates Art. II, Sec. I, Par. I of the Georgia Constitution of 1983, which provides that "[e]lections by the people shall be by secret ballot and shall be conducted in accordance with procedures provided by law." It is undisputed that voters' ballots are kept secret. In the law providing procedures for conducting elections, ballots are defined so as to include "electronic" ballots. OCGA §§ 21-2-2 (1), (18), 21-2-280. Furthermore, other jurisdictions have unanimously

concluded that statutes authorizing the use of voting machines are not in contravention of constitutional provisions requiring that all votes shall be by "ballot," on the theory that the word "ballot" was not used in its literal sense, but only for the purpose of designating a method of conducting elections which will insure secrecy and the integrity of the ballot.

*Porter v. Oklahoma City*, 446 P2d 384, 389 (Okla. 1968). See also *Mills v. Shelby County Election Comm.*, supra at 41 (construing "ballot," appearing in the phrase "ballot box" in the Tennessee Constitution, as not prohibiting electronic voting). We perceive nothing in Art. II, Sec. I, Par. I of the Georgia Constitution of 1983

which would limit voting to some method or methods under which each voter indicates his choice or choices on a separate piece of paper issued to him for that purpose. We

> hold that it contemplates that the Legislature shall provide a method, or methods, of voting at elections in such a way that not even those who count or tabulate the votes will know how any particular voter voted.

*Porter v. Oklahoma City*, supra at 390.

For similar reasons, we also reject Appellants' contention that the right of "elections by the people" in Art. II, Sec. I, Par. I is violated by the delegation of critical election functions to voting machine processes that allegedly cannot be verified or audited "by the people." The Georgia Constitution does not dictate the particular method of retention, storage, and counting of the votes. See *Porter v. Oklahoma City*, supra (also involving a state constitution referring to "elections by the people"). Those portions of the DRE equipment which store and count the number of votes do not vitiate the nature of elections as "by the people." Instead, they simply take the place of ballot boxes and human counters. See *Porter v. Oklahoma City*, supra at 391. As the trial court points out, the fact that voters "cannot actually see the electronic record within the machine does not mean that the vote was not accurately recorded or not recorded at all. The machines have an internal storage unit that can be audited in order to confirm the ballots cast."

3. Appellants assert that current implementation of the DRE voting system fails to assure that each vote is accurately counted and, thus, fails to comply with the statutory requirement that "[i]t shall, when properly operated, record correctly and accurately every vote cast." OCGA § 21-2-379.1 (8). However, the undisputed evidence shows that the touch-screen machines accurately record each vote when they are "properly operated." Contrary to Appellants' further contention, uncontroverted evidence shows that the Secretary of State has properly certified the DRE voting system pursuant to OCGA § 21-2-379.2.

4. Appellants urge that, unlike paper ballots, the touch-screen voting system does not allow for legitimate recounts and thereby subverts the intent of the recount law. Although that law does not specifically set out recount procedures for electronic voting systems, it does clearly recognize that recount procedures for paper ballots necessarily differ from recanvassing procedures for mechanical voting machines and, thus, contrary to Appellants' argument, that tangible ballots with custodial linkage to individual voters are not an absolute requirement for every voting system. OCGA § 21-2-495. Moreover, the trial court correctly concluded that Appellants' contentions regarding the accuracy of recounts "are merely hypothetical and cannot serve as a basis for declaratory relief." See *Cheeks v. Miller*, 262 Ga. 687, 688 (425 SE2d 278) (1993); *Mills v. Shelby*

*County Election Comm.*, supra at 39-40.

5. The trial court correctly dismissed as moot those counts of the complaint which challenged the "2006 Georgia Accuracy in Elections Act," as it was repealed on February 1, 2007 pursuant to Ga. L. 2006, pp. 557, 560, § 2 (former OCGA § 21-2-379.12 (g)). See *Pawnmart, Inc. v. Gwinnett County*, 279 Ga. 19, fn. 1 (608 SE2d 639) (2005); *City of Mountain View v. Sosebee*, 147 Ga. App. 535 (249 SE2d 671) (1978). Appellants' claims regarding former OCGA § 21-2-301, which authorized the 2001 Pilot Project, are likewise moot, as it was repealed by Ga. L. 2003, pp. 517, 533, § 29. See *Pawnmart, Inc. v. Gwinnett County*, supra; *City of Mountain View v. Sosebee*, supra. Therefore, there is no merit in Appellants' contention that they are entitled to mandamus relief for the purpose of compelling performance of duties set forth in former OCGA § 21-2-301 (b). *Skrine v. Kim*, 242 Ga. 185, 186-187 (249 SE2d 534) (1978).

6. Although we have addressed every enumeration of error, Appellants take issue in some detail with numerous findings and conclusions in the trial court's order. To the extent that Appellants' remaining contentions have not been fully addressed above, we find, after thoroughly reviewing all of those contentions in light of the record, that they either are without merit or do not require reversal. See *Davis v. Harpagon Co.*, 283 Ga. 539, 542 (6) (661 SE2d 545) (2008).

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 28, 2009.

*Maddox & Harding, Todd A. Harding, Walker L. Chandler*, for appellants.

*Thurbert E. Baker, Attorney General, Stefan E. Ritter, Senior Assistant Attorney General*, for appellees.