Esperanza ANDRADE, in her Official
Capacity as Secretary of State for
the State of Texas, Petitioner,

v.

NAACP OF AUSTIN, Nelson Linder,
Sonia Santana, and David Van
Os, Respondents.

No. 09–0420.

Supreme Court of Texas.

Argued Oct. 12, 2010.

Delivered July 1, 2011.

Greg W. Abbott, Attorney General of Texas, Clarence Andrew Weber, Kelly Hart & Hallman LLP, David S. Morales, Office of the Attorney General of Texas Deputy First Assistant Attorney General, Kristofer S. Monson, Assistant Solicitor General, Kathlyn C. Wilson, Assistant Attorney General, General Litigation Division, Austin TX, James C. Ho, Gibson Dunn & Crutcher LLP, Dallas TX, for Petitioner.

James C. Harrington, Peter (Jody) Barton, Texas Civil Rights Project, Timothy J. Herman, HowryBreen, LLP, Jason P. Steed, Akin Gump Strauss Hauer & Feld LLP, Wayne Krause, Joseph P. Berra, Texas Civil Rights Project, Austin TX, for Respondents.

Chief Justice JEFFERSON delivered the opinion of the Court.

Technology is changing the way we vote. It has not eliminated controversy about the way votes are recorded and verified. We must decide whether voters have standing to pursue complaints about an electronic voting machine that does not produce a contemporaneous paper record of each vote. Because we conclude that most of the voters' allegations involve generalized grievances about the lawfulness of government acts, and because their remaining claims fail on their merits, we reverse the court of appeals' judgment and render judgment dismissing the case.

## I. Background

Voters in different parts of the state utilize a number of different voting systems, all of which must first be certified by the Secretary of State.[1] TEX. ELEC.CODE §§ 122.001, .031. To obtain certification, voting system manufacturers must submit an application to a board of examiners appointed by the Secretary and the Attorney General. *Id.* §§ 122.034–.035. After the board prepares a report, *id.* § 122.036, the Secretary conducts a public hearing to provide interested persons an opportunity to express their views about a particular system, *id.* § 122.0371. The Secretary reviews the report, considers public input, and determines whether the system has satisfied the applicable approval requirements. *Id.* § 122.038(a). If so, she certifies the system for use in elections. *Id.* § 122.038(c). For each application, she submits a report explaining whether the system was approved. *Id.* § 122.039. Once

a system is certified, local political subdivisions may adopt it for use in elections. *Id.* § 123.001.

Following certification and adoption, additional testing is required for direct recording electronic machines (DREs). DREs are designed "to allow a direct vote on the machine by the manual touch of a screen, monitor, or other device." *Id.* § 121.003(12). DREs store individual votes and vote totals electronically, *id.*, usually in several places within the unit, *see* Daniel P. Tokaji, *The Paperless Chase: Electronic Voting and Democratic Values*, 73 FORDHAM L.REV. 1711, 1724 (2005). Immediately after receiving a DRE from a vendor, the election records custodian must perform a hardware diagnostic test and a "public test of logic and accuracy." TEX. ELEC.CODE § 129.021. The latter involves creating a testing board that will then cast votes, verifying that each contest can be voted and is accurately counted. *Id.* § 129.023. The test must evaluate, to the extent possible, undervotes, overvotes, straight-party votes, and crossover votes. *Id.* It must also account for write-in and provisional votes. *Id.* Notice of the test must be published at least forty-eight hours in advance, and the test is open to the public. *Id.* § 129.023(b). The test is successful only if the actual results are identical to the expected results. *Id.* § 129.023(d). Travis County conducts these tests before each early voting period and election day.[2] The Secretary of State may prescribe additional testing. *Id.* § 129.021(4). DREs must also satisfy, to the extent possible, requirements applicable to other electronic voting systems.[3] *Id.* § 129.001(b).

---

1. The Secretary of State is the state's chief election officer. TEX. ELEC.CODE § 31.001(a).

2. *See Frequently Asked Questions About eSlate,* TRAVIS COUNTY, http://www.co.travis.tx.us/county_clerk/election/eSlate/faq.asp (all Inter-

net materials as visited June 29, 2011 and available in clerk of Court's file).

3. An "electronic voting system" is one in which "the ballots are automatically counted and the results automatically tabulated by use

In countywide polling place programs, the Secretary requires an audit of each DRE before, after, and, if feasible, during each election. *Id.* § 43.007(c). The general custodian of election records must secure access control keys or passwords to DREs, and use of such keys and passwords must be witnessed and documented. *Id.* § 129.053. The DRE may not be connected to any external communications network, including the Internet, nor are wireless communications permitted (except under certain limited circumstances). *Id.* § 129.054. The general custodian of election records must create a contingency plan in case of DRE failure. *Id.* § 129.056.

Copies of the program codes, operator manuals, and copies or units of all other software and any other information, specifications, or documentation required

by the Secretary must be kept on file with the Secretary. *Id.* § 122.0331(a). The Secretary also requires that DREs meet or exceed the minimum requirements established by the Federal Election Commission. 1 TEX. ADMIN. CODE § 81.61 (requiring compliance with FEC's Performance and Test Standards for Punch Card, Mark Sense, and Direct Record Electronic Voting Systems). Although DREs must provide contemporaneous printouts of "significant election events,"[4] there is no explicit statutory requirement that DREs provide a contemporaneous paper record of each vote cast. Repeated efforts to pass such legislation have failed, both at the federal[5] and state[6] levels.

The eSlate, a paperless DRE manufactured by Hart Intercivic, is one of a handful of DREs the Secretary has certified.

of electronically operated apparatus." TEX. ELEC.CODE § 121.003(2). These can include optical scan ballots, a technology familiar to many through its use in standardized testing. *See* Daniel P. Tokaji, *The Paperless Chase: Electronic Voting and Democratic Values*, 73 FORDHAM L.REV. 1711, 1721 (2005).

4. 1 TEX. ADMIN. CODE § 81.62(a). "Significant election events" include error messages, the number of ballots read for a given precinct, completion of reading ballots for a given precinct, the identity of the input ports used for modem transfers from precincts; users logging in and out from the election system, precincts being zeroed, reports being generated, diagnostics of any type being run, and change to printer status. *Id.* § 81.62(b).

5. Neither the Voter Confidence and Increased Availability Act of 2003, the Restore Elector Confidence in Our Representative Democracy Act of 2004, the Voter Confidence and Increased Accessibility Act of 2007, nor the Voter Confidence and Increased Accessibility Act of 2009, all of which would have required a voter-verified paper ballot, became law. *See* Voter Confidence and Increased Availability Act of 2009, H.R. 2894, 111th Cong. (2009), *available at* http://www.govtrack.us/congress/

bill.xpd?bill=h111-2894; Voter Confidence and Increased Availability Act of 2009, S. 1431, 111th Cong. (2009), *available at* http://www.govtrack.us/congress/bill.xpd?bill=s111-1431; Voter Confidence and Increased Availability Act of 2007, H.R. 811, 110th Cong. (2007), *available at* http://www.govtrack.us/congress/bill.xpd?bill=h110-811; Restore Elector Confidence in Our Representative Democracy Act of 2004, S. 2313, 108th Cong. (2004), *available at* http://www.govtrack.us/congress/bill.xpd?bill=s108-2313; Voter Confidence and Increased Availability Act of 2003, H.R. 2239, 108th Cong. (2003), *available at* http://www.govtrack.us/congress/bill.xpd?bill=h108-2239.

6. *See* Tex. S.B. 245, 81st Leg., R.S. (2009); Tex. H.B. 3636, 81st Leg., R.S. (2009); Tex. H.B. 112, 81st Leg., R.S. (2009); Tex. H.B. 638, 81st Leg., R.S. (2009); Tex. S.B. 1247, 80th Leg., R.S. (2007); Tex. S.B. 1006, 80th Leg., R.S. (2007); Tex. H.B. 3891, 80th Leg., R.S. (2007); Tex. H.B. 384, 80th Leg., R.S. (2007); Tex. H.B. 123, 80th Leg., R.S. (2007); Tex. H.B. 65, 80th Leg., R.S. (2007); Tex. S.B. 94, 79th Leg., R.S. (2005); Tex. H.B. 3083, 79th Leg., R.S. (2005); Tex. H.B. 2259, 79th Leg., R.S. (2005); Tex. H.B. 1289, 79th Leg., R.S. (2005).

*See Voting Systems,* TEXAS SECRETARY OF STATE, http://www.sos.state.tx.us/elections/laws/votingsystems.shtml. Voters arriving at the polls in counties using the eSlate are given a unique access code. The voter enters the code into the eSlate, which then displays the ballot. Voters turn a dial to highlight their ballot choice and then press "enter" to make a selection. After a voter completes his selections, the eSlate displays a ballot summary page. If the voter's choices are correctly displayed, the voter presses the "cast ballot" button, and the vote is recorded. *See Voter Instructions,* TRAVIS COUNTY, http://www.co.travis.tx.us/county_clerk/election/eSlate/pdfs/English_Flyer_050923.pdf. Travis County purchased the eSlate system in 2001 and has used it since 2003.

The NAACP of Austin, its president Nelson Linder, Sonia Santana (a Travis County voter), and David Van Os (a candidate for attorney general) (collectively, the voters), sued Esperanza Andrade, the Secretary of State,[7] arguing that her certification of the eSlate violated the Election Code and our constitution. The voters assert that the Secretary's failure to require a contemporaneous paper record of an electronic vote violates their statutory right to a recount and an audit, as well as Texas constitutional guarantees of equal protection, the purity of the ballot box, and the right of suffrage. *See* TEX. CONST. art. I, § 3, art. VI, § 2(c), art. VI, § 4; TEX. ELEC.CODE §§ 122.001, 211.001. The voters sought a declaration that the Secretary acted illegally and an injunction prohibiting the use of paperless election systems without an independent paper ballot mechanism.

The Secretary filed a plea to the jurisdiction and motion for summary judgment, asserting that the voters lacked standing to pursue their claims and that she was immune from suit. The trial court denied the plea and motion, and a divided court of appeals affirmed. 287 S.W.3d 240. We granted the petition for review[8] and now reverse. 53 Tex. Sup.Ct. J. 562 (Apr. 9, 2010).

## II. The voters have standing to assert an equal protection claim.

Because the voters seek only declaratory and injunctive relief, and because each voter seeks the same relief, only one plaintiff with standing is required. *See Barshop v. Medina Cnty. Underground Water Conservation Dist.,* 925 S.W.2d 618, 627 (Tex.1996).[9] Accordingly, we examine

---

7. The voters initially sued Roger Williams, who was then Secretary of State. He was succeeded by Phil Wilson, who was automatically substituted in Williams's stead. TEX. R.APP. P. 7.2(a). When Andrade succeeded Wilson, she replaced him as the named party. The voters also sued the Travis County Clerk, but the trial court dismissed her from the case, and she is not a party to this appeal.

8. We have jurisdiction over this interlocutory appeal because the justices of the court of appeals disagree on a material question of law. TEX. GOV'T CODE § 22.225(c).

9. *See also Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47, 52 n. 2, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (holding that the presence of one party with standing satisfies case-or-controversy requirement); *Bowsher v. Synar,* 478 U.S. 714, 721, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (because union members had standing to challenge statute's constitutionality, court "need not consider the standing issue as to the Union or Members of Congress"); *Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 264, 264 n. 9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (holding that because "at least one *individual plaintiff ... has demonstrated* standing," court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit"); *Crawford v. Marion Cnty. Election Bd.,* 472 F.3d 949, 951 (7th Cir.2007), *aff'd,* 553 U.S. 181, 189 n. 7, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008); *cf. Corpus Christi People's Baptist*

whether Sonia Santana, a Travis County resident and registered voter, has standing to pursue the claims she asserts. We may look to the similar federal standing requirements for guidance,[10] and "[o]ur threshold inquiry ... 'in no way depends on the merits of the [voters'] contention that particular conduct is illegal.' "[11]

■ Generally, a citizen lacks standing to bring a lawsuit challenging the lawfulness of governmental acts.[12] *Brown v. Todd*, 53 S.W.3d 297, 302 (Tex.2001). Thus, "[s]tanding doctrines reflect in many ways the rule that neither citizens nor taxpayers can appear in court simply to insist that the government and its officials adhere to the requirements of law." CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 3531.10 (3d ed.2008). This pragmatic approach "ensures that 'there is a real need to exercise the power of judicial review' in a particular case, and it helps guarantee that courts fashion remedies 'no broader than required by the precise facts to which the court's ruling would be applied.' " *Lance v. Coffman*, 549 U.S. 437, 441, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007) (citations omitted). Based partly on the notion of judicial self governance, this rule recognizes that other branches of government may more appropriately decide "abstract ques-

tions of wide public significance," particularly when judicial intervention is unnecessary to protect individual rights. *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

Originally characterized as prudential,[13] the Supreme Court has more recently clarified that the "generalized grievance" bar to standing is constitutional. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573–74, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (holding that a citizen raising "only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy").[14] The bar is based not on the number of people affected—a grievance is not generalized merely because it is suffered by large numbers of people. ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 91 (3d ed.2006). As the Supreme Court has noted, "[t]o deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody."

*Church, Inc. v. Nueces Cnty. Appraisal Dist.*, 904 S.W.2d 621, 624 (Tex.1995) (declining to address county's standing because no one challenged it and because another party had standing).

10. *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001).

11. *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (quoting *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

12. Federal law is in accord. *Allen v. Wright*, 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("This Court has repeatedly held

that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court.").

13. *See Warth*, 422 U.S. at 499, 95 S.Ct. 2197 (holding that individuals lack standing "when the asserted harm is a generalized grievance shared in substantially equal measure by all or a large class of citizens").

14. *See also* ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 96 (3d ed.2006) (noting that *"Lujan* likely means that the bar against generalized grievances will be treated as constitutional and not prudential in the future").

*United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 686–88, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Thus, "where a harm is concrete, though widely shared, the Court has found injury in fact." *FEC v. Akins,* 524 U.S. 11, 24, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (citation omitted).

Instead, the proper inquiry is whether the plaintiffs sue solely as citizens who insist that the government follow the law. CHEMERINSKY, CONSTITUTIONAL LAW 91. For example, the Supreme Court has held that citizens lacked standing to sue for a violation of a constitutional provision prohibiting members of Congress from serving in the executive branch. *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 217–27, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). It has also rejected citizen standing in a case seeking to have parts of the CIA Act declared unconstitutional because it violated the Constitution's Statement and Accounts Clause. *United States v. Richardson,* 418 U.S. 166, 179–80, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). We have held that a voter and citizen lacked standing to enjoin a purportedly illegal executive order signed by the mayor. *Brown,* 53 S.W.3d at 304. The line between a generalized grievance and a particularized harm is difficult to draw,[15] and it varies with the claims made.

We recognized the principle over a century ago, when we held that a citizen could not, through litigation, challenge San Antonio's decision to build city hall on what was then a military plaza. *City of San Antonio v. Stumburg,* 70 Tex. 366, 7 S.W. 754, 755 (1888) (holding that "no action lies to restrain an interference with a mere public right, at the suit of an individual who has not suffered or is not threatened with some damage peculiar to himself"). And we have stated the general proposition broadly, applying it to voters: "No Texas court has ever recognized that a plaintiff's status as a voter, without more, confers standing to challenge the lawfulness of government acts." *Brown,* 53 S.W.3d at 302. Instead, "[o]ur decisions have always required a plaintiff to allege some injury distinct from that sustained by the public at large." *Id.* But we have also been careful to suggest that challenges to the election process may be different. *Id.* (noting that "[t]his Court has never recognized standing on the basis of the results—as opposed to the process—of an initiative election").

The Secretary urges a blanket rule that would ensure no voter ever has standing to challenge a voting system. We think the Secretary overreaches in that respect. The voters assert a denial of equal protection—a claim voters often have standing to bring. *See Baker v. Carr,* 369 U.S. 186, 206, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (noting that voters have standing to bring equal protection challenges to complain of vote dilution, and observing that "[m]any of the cases have assumed rather than articulated the premise in deciding the merits of similar claims").[16] For example, the Supreme Court has permitted Virginia residents to sue for a declaration that Virginia's poll tax was unconstitutional. *Harper v. Va. State Bd. of Elections,* 383 U.S. 663, 666, 86 S.Ct. 1079, 16 L.Ed.2d 169

---

15. *See* Charles Alan Wright, et al., Federal Practice & Procedure § 3531.10 n. 26 (3d ed.2008)(noting the "evanescent, almost magical" distinctions in some such cases).

16. *See also* CHEMERINSKY, CONSTITUTIONAL LAW 71, 91, 97 (stating that "[i]n general, a person who claims discrimination or a violation of an individual liberty ... will be accorded standing"); WRIGHT, FEDERAL PRACTICE & PROCEDURE § 3531.10 n. 62 (noting that "[o]rdinarily, courts do not even pause to confirm standing in cases of this sort").

(1966) (holding that poll tax violated the equal protection clause). It has allowed a Hawaii voter to challenge as unconstitutional the state's ban on write-in candidates. *Burdick v. Takushi*, 504 U.S. 428, 430, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). It has authorized a voter to challenge Tennessee's durational residence requirement. *Dunn v. Blumstein*, 405 U.S. 330, 333, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). Voters residing in racially gerrymandered districts have standing to sue (although voters residing outside those districts do not). *United States v. Hays*, 515 U.S. 737, 744–45, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). A voter in Georgia may sue to enjoin that state's allegedly unconstitutional county unit system as a basis for counting votes. *Gray v. Sanders*, 372 U.S. 368, 375, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) (holding that "appellee, like any person whose right to vote is impaired, has standing to sue" (citations omitted)). And Tennessee voters may sue to enjoin a statute apportioning legislators among the state's ninety-five counties. *Baker*, 369 U.S. at 206, 82 S.Ct. 691.

■ In *Baker*, the Supreme Court explained that voters had standing to challenge a state's apportionment scheme because

[t]he injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality *vis-a-vis* voters in irrationally favored counties.... It would not be necessary to decide whether appellants' allegations of impairment of their votes by the [apportionment] will, ultimately, entitle them to any relief, in order to hold that they have standing to seek it. *If such impairment does produce a legally cognizable injury, they are among those who have sustained it.* They are asserting a 'plain, direct and adequate interest in maintaining the effectiveness of their votes,' not merely a claim of 'the right, possessed by every citizen, to require that the Government be administered according to law....'

369 U.S. at 208, 82 S.Ct. 691 (emphasis added) (citations omitted); *see also* Tokaji, 73 FORDHAM L.REV. at 1752 (noting that "the use of voting machines disfavoring identifiable groups of voters, defined by place of residence, is constitutionally problematic" and noting that such claims are analogous to the "one person, one vote" cases). While equal protections claims involving the use of DREs have been largely unsuccessful,[17] none has been dismissed for

17. *See, e.g., Wexler v. Anderson*, 452 F.3d 1226 (11th Cir.2006) (affirming judgment against voter (and others) who alleged that DRE violated equal protection); *Weber v. Shelley*, 347 F.3d 1101, 1106–07 (9th Cir.2003) (same); *Favorito v. Handel*, 285 Ga. 795, 684 S.E.2d 257, 261–62 (2009) (same); *Gusciora v. Corzine*, No. MER–L–2691–04, 2010 WL 444173, *————, 2010 N.J.Super. Unpub. LEXIS 2319, *332–33 (N.J.Super.Ct. Law Div.2010) (holding that State's certification of DREs did not violate voters' equal protection or due process rights); *see also Tex. Democratic Party v. Williams*, 285 Fed.Appx. 194, 195 (5th Cir. 2008) (per curiam) (affirming summary judgment in favor of Secretary of State in case involving allegations that eSlate deprived voters of equal protection and due process and violated the Election Code), *cert. denied*, —— U.S. ——, 129 S.Ct. 912, 173 L.Ed.2d 110 (2009); *Schade v. Md. State Bd. of Elections*, 401 Md. 1, 930 A.2d 304, 328 (2007) (holding that trial court correctly denied voters' and candidates' requests for preliminary injunction, as state board of elections acted reasonably in certifying DREs that lacked a voter verified paper audit trail). *But see Chavez v. Brewer*, 222 Ariz. 309, 214 P.3d 397, 408–09 (Ariz.Ct.App.2009) (holding that plaintiffs' claims that voting machines violated two provisions (the "free and equal election" provision and the "privileges and immunities clause") of the Arizona Constitution survived Arizona rule 12(b)(6) motion to dismiss); *Banfield v. Cortes*, 922 A.2d 36, 42 (Pa.

lack of standing.[18]

The Secretary argues that because the voters have not shown that their votes actually were miscounted, they have not sustained the kind of concrete, particularized injury standing requires. But the voters' equal protection complaint is that the eSlate is susceptible to fraud and prone to malfunction, depriving them of the ability to determine whether their votes were counted. They assert that it is less probable that their votes will be counted than will the votes of residents of other Texas counties or absentee voters in Travis County. It is not necessary to decide whether the voters' claims will, ultimately, entitle them to relief, in order to hold that they have standing to seek it. "If such impairment does produce a legally cognizable injury, they are among those who have sustained it." *Baker*, 369 U.S. at 207–08, 82 S.Ct. 691. Because they assert "a plain, direct and adequate interest in maintaining the effectiveness of their votes, not merely a claim of the right, possessed by every citizen, to require that the Government be administered according to law," the voters have standing to pursue their equal protection claim. *Id.* (citations omitted).

The Secretary next asserts that equal protection claims rooted solely in geographical distinctions are insufficient to confer voter standing, citing our decision in *Texas Department of Transportation v. City of Sunset Valley*, 146 S.W.3d 637, 646–647 (Tex.2004). In that case, we held that a county resident had no standing to bring an equal protection claim on behalf of a class challenging the Department's purported failure to accord one county the same treatment other counties received. We held that state and federal equal-protection guarantees relate to "equality between persons as such, rather than between areas, and ... territorial uniformity is not a constitutional prerequisite." *Id.* at 646–47 (citation omitted). We noted that when the State exercises governmental powers, it necessarily draws distinctions between geographic areas, and if citizens were entitled to equal treatment every time government money was spent, almost every government program would be unconstitutional. *Id.* at 647. Although framed as a standing question, we ultimately held that the claims failed as a matter of law. *Id.*

*Sunset Valley*'s rule applies to equal protection claims generally, but not to cases involving voting-related equal protection claims. The latter are often based precisely on disparate treatment among voters in different geographical areas. *See, e.g., Dunn*, 405 U.S. at 336, 92 S.Ct. 995 ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Reynolds v. Sims*, 377 U.S. 533, 563, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable."); *Wesber-*

Commw.Ct.2007) (refusing to dismiss electors' claims that secretary of state had illegally certified DREs).

18. This is not suggest that the generalized grievance bar does not apply to equal protection claims. It does, and a plaintiff's failure to allege that he has been denied equal treatment will deprive him of standing. *United States v. Hays*, 515 U.S. 737, 743–44, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) ("The rule against generalized grievances applies with as much force in the equal protection context as in any other," and "only ... those persons who are personally denied equal treatment" will have standing (quotations omitted)); *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 647 (Tex.2004) (holding that "the generalized grievance bar to standing ... also applies to equal-protection claims like those asserted here").

*ry v. Sanders,* 376 U.S. 1, 7–8, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) ("[A]s nearly as is practicable[,] one man's vote in a congressional election is to be worth as much as another's."); *Gray v. Sanders,* 372 U.S. 368, 381, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) (invalidating vote-counting method that weighted rural votes more heavily than urban ones); *see also ACLU of N.M. v. Santillanes,* 546 F.3d 1313, 1319 (10th Cir. 2008) (holding that voters had standing to bring equal protection claim challenging voter-identification law due to claim of unequal treatment of in-person voters (who had to show identification) and absentee voters (who did not)); Tokaji, 73 FORDHAM L.REV. at 1748 (noting that "the [Supreme] Court has closely scrutinized certain election practices which deny or dilute the right to vote, especially when they disadvantage an identifiable group of voters based upon wealth or place of residence").

The voters assert that they are forced to use the eSlate while other Travis County voters use an absentee or paper ballot. They also complain that voters in other parts of Texas are not forced to use the eSlate. Without examining the merits of the claim, this disparity gives them standing to sue for an equal protection violation. *Cf. Bush v. Gore,* 531 U.S. 98, 104–05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) ("Having once granted the right to vote on equal terms, the state may not, by later arbitrary and disparate treatment, value one person's vote over that of another.").

### III. The State's regulatory interest justifies this reasonable, nondiscriminatory restriction on the right to vote.

■ We turn then to the merits of the voters' equal protection challenge, cognizant that the Secretary retains immunity from suit unless the voters have pleaded a viable claim. *See* TEX. CONST. art. I, § 3;

*City of Elsa v. M.A.L.,* 226 S.W.3d 390, 392 (Tex.2007) (per curiam) (holding that " 'suits for injunctive relief' may be maintained against governmental entities to remedy violations of the Texas Constitution" (quoting *City of Beaumont v. Bouillion,* 896 S.W.2d 143, 149 (Tex.1995))); *see also Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226–28 (Tex. 2004).

The voters assert two equal protections claims. Broadly, they complain that voters who cast paper ballots have a greater level of protection against fraud or system malfunction than DRE voters do. The voters do not allege that DREs are less accurate—that they suffer from higher error rates or lead to more invalid ballots—than other voting systems. Instead, they complain that DREs' vulnerabilities make it more likely that votes will be manipulated or lost. More narrowly, the voters make a recount-related claim. Recounts of "regular paper ballots" are conducted manually, by a counting team composed of three individuals. TEX. ELEC.CODE §§ 214.001–.002. One person reads the ballots; the other two tally the votes. *Id.* § 214.002. Votes from DREs are recounted differently. A person requesting a recount of electronic voting system ballots has three choices: (1) an electronic recount using the same program as the original count; (2) if the program is defective, an electronic recount using the corrected program; or (3) a manual recount. *Id.* § 214.042(a). The voters assert that the paperless computerized voting systems only allow for a retabulation of the votes cast and recorded, which creates a disparity in the manual recount methodology. Voters not required to use the DRE (absentee, military, or those living in a Texas county that does not use the eSlate) are granted the right to a hand recount of votes, and the voters allege that this re-

count disparity violates constitutional equal protection guarantees.

■ The right to vote is fundamental, as it preserves all other rights. *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *see also Bush,* 531 U.S. at 104, 121 S.Ct. 525 ("When the state legislature vests the right to vote ... in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter."). But that does not mean states cannot regulate the franchise. *Burdick,* 504 U.S. at 433, 112 S.Ct. 2059 (holding that although voting is a fundamental right, "[i]t does not follow ... that the right to vote in any manner ... [is] absolute"); *Dunn,* 405 U.S. at 336, 92 S.Ct. 995 (noting that "the States have the power to impose voter qualifications, and to regulate access to the franchise").

■ Instead, the Supreme Court has explained that laws impacting the right to vote must be evaluated on a sliding scale: when the law severely restricts the right to vote, the regulation must be narrowly drawn to advance a compelling state interest. *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059. But when a state election law provision imposes " 'reasonable, nondiscriminatory restrictions' " upon voters' constitutional rights, "'the State's important regulatory interests are generally sufficient to justify' the restrictions." [19] *Id.* at 433–34, 112 S.Ct. 2059 (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)) (noting that "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest ... would tie the

hands of States seeking to assure that elections are operated equitably and efficiently").

So our initial determination depends on the severity of the burden on the right to vote. The United States Court of Appeals for the Ninth Circuit, one of three federal circuit courts to reject equal protection challenges to DREs, has held that the use of paperless, touchscreen voting systems does not severely restrict the right to vote. *Weber v. Shelley,* 347 F.3d 1101, 1106–07 (9th Cir.2003). As that court noted, DREs "bring[ ] about numerous positive changes (increasing voter turnout, having greater accuracy than traditional systems, being user-friendly, decreasing the number of mismarked ballots, saving money, etc.)." *Id.* at 1106. That court held that, under *Burdick,* the use of DREs was not subject to greater scrutiny simply because the system may make the possibility of some kinds of fraud more difficult to detect. *Id.* at 1106–07.

> We cannot say that use of paperless, touchscreen voting systems severely restricts the right to vote. No balloting system is perfect. Traditional paper ballots, as became evident during the 2000 presidential election, are prone to overvotes, undervotes, "hanging chads," and other mechanical and human errors that may thwart voter intent. *See generally Bush v. Gore,* 531 U.S. 98 [121 S.Ct. 525, 148 L.Ed.2d 388] (2000). Meanwhile, touchscreen voting systems remedy a number of these problems, albeit at the hypothetical price of vulnerability to programming "worms." The [DRE] does not leave Riverside voters without any protection from fraud, or any means of verifying votes, or any way to audit or recount. The unfortunate reality is that the possibility of electoral

---

19. "[T]he federal analytical approach applies to equal protection challenges under the Tex-

as Constitution." *Bell v. Low Income Women of Texas,* 95 S.W.3d 253, 266 (Tex.2002).

fraud can never be *completely* eliminated, no matter which type of ballot is used. *Cf. Hennings v. Grafton,* 523 F.2d 861, 864 (7th Cir.1975) ("Voting device malfunction [and] the failure of election officials to take statutorily prescribed steps to diminish what was at most a theoretical possibility that the devices might be tampered with . . . fall far short of constitutional infractions. . . ."). Weber points out that none of the advantages of touch-screen systems over traditional methods would be sacrificed if voter-verified paper ballots were added to touchscreen systems. However, it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems. So long as their choice is reasonable and neutral, it is free from judicial second-guessing. In this instance, California made a reasonable, politically neutral and non-discriminatory choice to certify touchscreen systems as an alternative to paper ballots. Likewise, Riverside County in deciding to use such a system. Nothing in the Constitution forbids this choice.

*Id.* (footnote omitted).

The Eleventh Circuit came to a similar conclusion. *See Wexler v. Anderson,* 452 F.3d 1226 (11th Cir.2006). Specifically, in considering whether differing recount mechanisms for DRE votes deprived DRE voters of equal protection, the court noted that "the differences [in] procedures [were] necessary given the differences in the technologies themselves and the types of errors voters are likely to make in utilizing those technologies." *Id.* at 1233. DRE voters were less likely to cast ambiguous votes than were voters using, say, optical scan ballots, on which a voter might leave a stray pencil mark or circle a candidate's name rather than filling in the appropriate bubble. *Id.* (noting that DREs "do not record ambiguous indicia of voter intent that can later be reviewed during a manual recount"); *see also* Tokaji, 73 Fordham L.Rev. at 1723 (noting that "it is not generally possible to overvote with DRE voting machines"). Moreover, the court noted that DREs had certain benefits, making voting more accessible to disabled voters and preventing some voter errors that were common with optical scan machines. Thus, Florida's regulatory interests justified the manual recount procedures and, "therefore, they do not violate equal protection." *Wexler,* 452 F.3d at 1233.

Adopting the reasoning of *Weber* and *Wexler,* the Georgia Supreme Court has also rejected an equal protection challenge to that state's DRE system,[20] as has the Superior Court of New Jersey.[21] Additionally, the United States Court of Appeals for the Fifth Circuit recently affirmed a summary judgment in the Secretary's favor, holding that the eSlate did not violate voters' rights under the First and Fourteenth Amendments to the United States Constitution. *See Tex. Democratic Party v. Williams,* 285 Fed.Appx. 194, 195 (5th Cir.2008) (per curiam) (noting that district court properly applied *Anderson* and *Burdick* balancing test to the constitutional claims raised), *cert. denied,* —— U.S. ——, 129 S.Ct. 912, 173 L.Ed.2d 110 (2009); *see also Tex. Democratic Party v. Williams,* No. A–07–CA–115–SS (W.D.Tex. August 16, 2007). In that case, voters complained that the eSlate deprived them of the ability to "em-

---

**20.** *Favorito v. Handel,* 285 Ga. 795, 684 S.E.2d 257, 261–62 (2009).

**21.** *Gusciora v. Corzine,* No. MER–L–2691–04, 2010 WL 444173, \*———— ——, 2010 N.J.Super. Unpub. LEXIS 2319, \*332–33 (N.J.Super.Ct. Law Div.2010).

phasis vote"; that is, to cast a straight party vote and then also again vote for a particular candidate within that party—to make sure their votes count for these particular candidates. The voters argued that, if they attempted to emphasis vote, the eSlate would de-select, rather than register a vote for, the individual candidate. The trial court held that even assuming that the eSlate impacted voters' ability to cast emphasis votes, the use of DREs was constitutionally permissible. *See Tex. Democratic Party v. Williams,* No. A–07–CA–115–SS (W.D.Tex. August 16, 2007) (noting that the Secretary "made a reasonable, politically neutral, and non-discriminatory choice to certify the eSlate voting machines for use in elections, and nothing in the Constitution forbids this choice" (footnote omitted)).

We agree with the conclusions reached by those courts. DREs are not perfect. No voting system is. We cannot say that DREs impose severe restrictions on voters, particularly in light of the significant benefits such machines offer. *See, e.g., Weber,* 347 F.3d at 1107; *see also* Tokaji, 73 FORDHAM L.REV. at 1741, 1754 (noting that "DREs can reduce uncounted votes and virtually eliminate the 'racial gap' that tends to exist with other types of equipment," "have the potential to expand access for people with disabilities and for voters with limited English proficiency," and "tend[ ] to considerably reduce the number of uncounted votes"). As the *Wexler* court noted, different recount methodologies are necessary for DREs because ambiguous votes—often scrutinized during recounts—are virtually eliminated. A DRE with a voter-verified paper audit trail may provide more security; it may not.[22] But the equal protection clause does not require infallibility. The Secretary made a reasonable, nondiscriminatory choice to certify the eSlate, a decision justified by the State's important regulatory interests. "[N]othing in the constitution forbids that choice." *Weber,* 347 F.3d at 1107.

**IV. The voters remaining claims are barred, either because the voters have no standing to assert them or because they are nonjusticiable.**

**A. Most of the voters' Article VI, section 4 claims involve generalized grievances about the lawfulness of government acts.**

 The voters' standing to pursue an equal protection claim does not translate into standing for their remaining claims. Instead, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. FEC,* 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (citations and quotations omitted). In additional to the equal protection clause, the voters complain that the Secretary has violated two other constitutional provisions. The first, article VI, section 4, states:

---

**22.** One commentator suggests that requiring contemporaneous paper records of DRE votes is problematic:

First, it relies on the false assumption that paper-based systems are inherently more accurate and reliable than paperless ones. Second, it disregards both long and recent experience demonstrating the vulnerability of paper-based systems to fraud and error. Third, it fails to comprehend the practical problems in actually implementing a system that is capable of printing out a contemporaneous paper record, yet preserves voter privacy and election security.

Tokaji, 73 FORDHAM L.REV at 1780–81; *see also id.* at 1736 (noting that "many election officials and some civil rights advocates have opposed a contemporaneous paper record requirement, arguing that it is unnecessary, burdensome, and likely to discourage adoption of accessible voting technology").

In all elections by the people, the vote shall be by ballot, and the Legislature shall provide for the numbering of tickets and make such other regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot box; and the Legislature shall provide by law for the registration of all voters.

TEX. CONST. art. VI, § 4.

This provision has four requirements: (1) votes shall be by secret ballot, (2) ballots shall be numbered, (3) the Legislature shall enact such other regulations as necessary to detect and punish fraud and preserve the purity of the ballot box, and (4) the Legislature may provide, by law, for the registration of voters in all cities. *Wood v. State ex rel. Lee,* 133 Tex. 110, 126 S.W.2d 4, 8 (1939).[23] The voters complain that the Secretary has violated the first three provisions.

First, they assert that the eSlate deprives them of a secret ballot. These allegations differ from the general thrust of the voters' claims, in that they do not complain specifically about the lack of a contemporaneous paper record of a vote cast. Instead, although the voters do not dispute that the eSlate permits them to cast secret ballots, they argue that the device is vulnerable to hackers, compromising vote secrecy. They also complain that the eSlate's audio output, available for disabled voters, can be overheard at a significant distance using only a shortwave radio.

Second, the voters allege that the eSlate's lack of a paper ballot violates the constitutional requirement that ballots be numbered. Although the eSlate numbers ballots, the voters contend that failing to require a paper ballot undermines the framers' intent in drafting the numbering requirement—a requirement they claim was intended to secure the integrity of the election process.

Assuming, as we must, that these allegations are true, they amount only to a generalized grievance shared in substantially equal measure by all or a large class of citizens. *See, e.g., Landes v. Tartaglione,* No. 04–3163, 2004 WL 2415074, *1–2, 2004 U.S. Dist. LEXIS 22458, *4–5 (E.D.Pa. Oct. 28, 2004) (holding that voter lacked standing to complain of electronic voting machines that might malfunction or be tampered with), *aff'd,* 153 Fed.Appx. 131 (3d Cir.2005), *cert. denied,* 547 U.S. 1040, 126 S.Ct. 1622, 164 L.Ed.2d 334 (2006). The voters' complaint that the lack of a contemporaneous paper record violates the spirit of the constitution is the kind of "undifferentiated, generalized grievance" about the conduct of government that courts cannot adjudicate. *Lance,* 549 U.S. at 442, 127 S.Ct. 1194. The voters' secret ballot allegations involve only hypothetical harm, not the concrete, particularized injury standing requires. *See DaimlerChrysler Corp. v. Inman,* 252 S.W.3d 299, 304–05 (Tex.2008).

All voting systems are subject to criminal manipulation, but there is no evidence or allegation that the eSlate has ever been manipulated in any Travis County election. Nor is there any proof that a Travis County disabled voter was deprived of the right to a secret ballot. In fact, the evidence is to the contrary: Travis County adopted the eSlate in part to comply with federal regulations aimed at facilitating the participation of the disabled in the voting pro-

---

**23.** At the time we decided *Wood,* our constitution limited this fourth requirement to cities containing a population of ten thousand inhabitants or more. *Wood v. State ex rel. Lee,*

133 Tex. 110, 126 S.W.2d 4, 8 (1939). The requirement is now applicable to "all voters." TEX. CONST. art. VI, § 4.

16

cess. *See* 42 U.S.C. §§ 15301–15545; *see also* Tokaji, 73 F<span>ORDHAM</span> L.R<span>EV</span>. at 1803 (noting that disabled voters "have the most to gain from implementation of DRE systems"). Not only does this last allegation fall within the generalized grievance category,[24] but it violates the prudential standing requirement that a plaintiff "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499, 95 S.Ct. 2197. The voters lack standing to bring these claims. *See* W<span>RIGHT</span>, F<span>EDERAL</span> P<span>RACTICE</span> & P<span>ROCEDURE</span> § 3531.10 (noting that "absent a more direct individual injury, violation of the Constitution does not itself establish standing").[25]

Finally, the voters assert that the lack of a contemporaneous paper record neither provides a means of detecting and punishing fraud, nor preserves the purity of the ballot box. But we have held that the "purity of the ballot box" provision requires only that *the Legislature* pass laws as necessary to deter fraud and protect ballot purity: "This constitutional provision is addressed to the sound discretion of the Legislature," and "[i]t is not for the courts to attempt to direct what laws the Legislature shall enact to comply with it." *Wood*, 126 S.W.2d at 9. The voters do not complain that the Legislature has failed to do so; to the contrary, they admit that it has. In the trial court, they alleged "[p]laintiffs do not find fault with the Code, or request that the Court rewrite it. The issue here is with the Secretary's application of the discretion provided him [sic] by the legislature." Without more, the voters

have not alleged a violation of article VI, section 4.

**B. The voters agree that the Legislature has satisfied article VI, section 2(c), and nothing more is required.**

Article VI, section 2(c) provides that "suffrage shall be protected by laws regulating elections and prohibiting under adequate penalties all undue influence in elections from power, bribery, tumult, or other improper practice." T<span>EX</span>. C<span>ONST</span>. art. VI, § 2(c).

The voters' 2(c) claim is difficult to discern. As alleged in their petition, the claim is derivative: they assert that the Secretary's alleged failure to comply with article VI, section 4 violates article VI, section 2(c) as well. In response to the Secretary's jurisdictional plea and motion for summary judgment, the voters mention 2(c) only in passing, and then only to state that "[e]lections should be absolutely free from influences of power and tumult." They assert that the Secretary's certification of easily "hacked" machines destabilizes citizen confidence and weakens democracy.

Assuming all that is true, section 2(c) requires only that the Legislature pass laws to eliminate improper election practices. *Cf. Wood*, 126 S.W.2d at 9. The voters do not dispute that the Legislature has done so. Their complaint is solely with the Secretary's certification of the DRE. Whatever the validity of that argument, it does *not* state a claim for a violation of section 2(c).

The Secretary then makes the curious argument that if part of what the voters allege is true—that she does not have ac-

24. *Hays,* 515 U.S. at 745, 115 S.Ct. 2431.

25. *See also Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 227, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) ("The proposi-

tion that all constitutional provisions are enforceable by any citizen simply because citizens are the ultimate beneficiaries of those provisions has no boundaries.").

cess to the software and records used in the Travis County system—the voters have pleaded a claim for a violation of the Election Code,[26] which automatically results in a violation of section 2(c). She suggests that a remand on this claim would be appropriate, so that she may controvert this fact issue. She cites no authority for the contention that a violation of the Election Code would violate section 2(c), and the text of 2(c) does not support such an argument. Moreover, the voters have not alleged a violation of those sections of the Election Code. Even if they had, the complaint amounts to a generalized grievance against governmental conduct of which they do not approve—a claim the voters lack standing to assert, as more fully discussed below. *Brown*, 53 S.W.3d at 302.

## VI. The voters lack standing to pursue their Election Code claims.

In addition to their equal protection recount claim, the voters allege that the Secretary's certification of the eSlate deprives them of their statutory right to a recount, which the Election Code defines as "the process conducted under this title for verifying the vote count in an election." Tex. Elec.Code § 211.002. Additionally, although their live pleading is silent on the point, the voters assert on appeal that the Secretary's certification of the eSlate violates the requirement that voting systems be capable of providing records from which the system's operation may be audited, and, therefore, the Secretary acted outside her authority in certifying the system. Tex. Elec.Code §§ 122.001, .032(a). Finally, although the voters did not plead it, the court of appeals noted that the voters'

evidence supported a claim that the eSlate does not comply with statutory requirements that the system operate "safely" and "accurately" and that it be "safe from fraudulent or unauthorized manipulation." Tex. Elec.Code § 122.001(a)(3), (4); 287 S.W.3d at 253 n. 10.

The voters argue that Election Code section 273.081, which authorizes injunctive relief for a person "who is being harmed or is in danger of being harmed by a violation or threatened violation of this code," gives them standing to pursue these claims. Tex. Elec.Code § 273.081. That provision, however, does not create standing—it merely authorizes injunctive relief. As we have noted, statutes like this, which permit " 'persons aggrieved,' 'persons adversely affected,' [or] 'any party in interest,' " to sue, still require that the plaintiff show how he has been injured or damaged other than as a member of the general public. *Scott v. Bd. of Adjustment*, 405 S.W.2d 55, 56 (Tex.1966).[27] This is because "[s]uch suits are essentially private in character and are for the protection of private rights." *Id.* at 56.

Here, the voters have made no showing that the Secretary's certification harmed them other than as members of the general public. Accordingly, for much the same reason their article VI claims are barred, the voters lack standing to pursue their Election Code complaints. Those allegations involve only generalized grievances about the lawfulness of government acts. *See, e.g., Favorito*, 684 S.E.2d at 263 (holding that voters' arguments regarding accuracy of recounts on DREs were "merely hypothetical and cannot serve as a basis

---

26. *See* Tex. Elec.Code §§ 122.002, .031.

27. *See also Cox v. Perry*, 138 S.W.3d 515, 518 (Tex.App.-Fort Worth 2004, no pet.) (noting that plaintiff-candidate had no standing under

section 273.081 to enjoin alleged Election Code violation, because "[a]ny such harm, in our view, is not distinct from harm to the general public").

for declaratory relief"). A desire to have the government act in conformance to the law is not enough,[28] and the voters assert no concrete, particularized harm to justify their claims here.[29] *See Brown,* 53 S.W.3d at 302.

## VI. Conclusion

 The voters raise legitimate concerns about system integrity and vulnerability. But these are policy disputes more appropriately resolved in the give-and-take of politics. Perhaps the Secretary will decide, as California has, to de-certify certain DREs.[30] Perhaps the Legislature will require a contemporaneous paper record of votes cast,[31] or perhaps Texas will curtail or abandon DRE use altogether.[32] But we cannot say the Secretary's decision to certify this device violated the voters' equal protection rights or that the voters can pursue generalized grievances about the lawfulness of her acts. "Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of [the Legislature] and the Chief Executive." *Lujan,* 504 U.S. at 576, 112 S.Ct. 2130. We reverse the court of appeals' judgment

and render judgment dismissing the case. Tex.R.App. P. 60.2(c).

**28.** *Allen,* 468 U.S. at 754, 104 S.Ct. 3315.

**29.** Although we have analyzed these claims from the perspective of a plaintiff (Sonia Santana) who is a voter, none of the remaining plaintiffs has standing either. The court of appeals held that the NAACP and its president, Nelson Linder, had standing because NAACP members were registered voters and participants in Travis County elections, as was Linder himself. 287 S.W.3d at 250–51. Their claims fail for the same reasons Santana's do. The remaining plaintiff is David Van Os, a candidate for attorney general in 2006. Van Os asserts only that as a former candidate, it is important to him that every vote be accurately recorded and verified. He also complains that, if he had to request a recount, there would be no way to detect a malfunction. He does not complain that he sought a

recount and was unable to receive one. At most, he has alleged a hypothetical harm— one that does not give him standing to pursue his claims.

**30.** *See* Stuart Pfeifer, *Some Counties Might Sue Over E–Voting Orders,* Los Angeles Times, May 4, 2004, at B 1 (describing secretary of state's decision to decertify paperless Diebold DRE voting machines).

**31.** According to the voters, thirty states have statutes mandating contemporaneous paper records of votes cast.

**32.** *See* The Pew Center on the States, Back to Paper: A Case Study (2008) (detailing five states that adopted DREs and then reversed course), *available at* http://www.pewcenteron thestates.org/uploadedFiles/EB21Brief.pdf