**FOURTH DIVISION**
**ELLINGTON, C. J.,**
**ANDREWS and BOGGS, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**November 16, 2012**

# In the Court of Appeals of Georgia

A12A0892. TENDER LOVING HEALTH CARE SERVICES OF
    GEORGIA, LLC et al. v. EHRLICH et al.

ELLINGTON, Chief Judge.

In this medical malpractice and wrongful death case, the plaintiffs, Howard

Ehrlich,[1] Barbara Woods, and Kenneth Ehrlich, the surviving children of the decedent,

Francine Ehrlich, sued the Emeritus Corporation, the owners of the nursing home

where the decedent lived for four months before succumbing to complications from

an infected sacral decubitus ulcer in November 2008 (hereinafter, "the nursing

home"). The plaintiffs also sued Tender Loving Health Care Services of Georgia,

LLC, d/b/a Staff Builders Home Health, a home health care company that supplied

skilled nurses to monitor and care for the decedent at the nursing home after she

---

[1] Howard Ehrlich sued in his individual capacity as a surviving son of the
decedent and as administrator of her estate.

developed the ulcer (hereinafter, "Staff Builders"). The defendants jointly appeal from the Superior Court of Fulton County's January 26, 2011 order denying their joint motion for a qualified protective order ("QPO") that would have allowed their attorneys to conduct ex parte interviews of the decedent's treating healthcare providers without the plaintiffs' permission.[2] They also appeal from the court's January 31, 2011 order denying their motion in the alternative, which asked the court to prohibit the plaintiffs from conducting ex parte interviews of those same healthcare providers. The defendants contend that the court's denial of their motions violated their constitutional rights to equal protection and due process. For the following reasons, we affirm the trial court's orders.

The plaintiffs' complaint contains the following relevant allegations.[3] In July 2008, the 88-year-old decedent began residing at the nursing home. At that time, she had a history of Alzheimer's disease with mild dementia and needed assistance with

---

[2] This Court granted the defendants' application for interlocutory review of the trial court's orders.

[3] The hearing on the defendants' motion for a QPO and motion in the alternative was not transcribed, and there are no answers to interrogatories or other sources in the record that otherwise support or contradict these allegations. We recite these allegations only to provide context to the issues on appeal, without ruling upon their accuracy or legal significance.

routine daily activities, but she was able to walk around with the help of a walker and did not have any decubitis ulcers (pressure wounds). On or about August 28, however, a nursing home employee noticed a pressure wound on the decedent's right buttock ("the wound"). At the request of the decedent's daughter, the decedent was transported to Northside Hospital on September 2, and a physician examined and treated the wound before releasing the decedent. Two days later, Staff Builders began providing skilled nurses to monitor and care for the wound at the nursing home. From September 4 until October 31, the wound became much larger, deeper, and infected, while the decedent's mental and physical status seriously declined.

On October 31, the decedent was examined at Cobb Hospital's wound treatment center and was immediately transferred to Kennestone Hospital, where she was admitted for treatment due to the severity of the wound. At that point, the wound had become a "large Stage IV decubitis ulcer" that was so deep it exposed the decedent's sacrum bone. Despite antibiotic therapy and surgical debridement of the wound, the decedent's condition deteriorated, and, on November 5, she was discharged from the hospital and transferred to a family member's home, where she received hospice care until her death ten days later.

In their July 2010 complaint, the plaintiffs asserted that the nursing home was vicariously liable for the negligence of their agents and employees in caring for, monitoring, and treating the decedent and that it was directly liable for negligently allowing her to remain at the facility after it knew or should have known that her condition mandated a transfer to a better equipped healthcare facility. They also asserted claims against the nursing home for statutory remedies resulting from alleged violations of state and federal laws governing the operation of nursing homes and patient rights. In addition, the plaintiffs asserted a professional negligence claim against Staff Builders, claiming that it was vicariously liable for the alleged negligence of its agents and employees.

The defendants answered the complaint and disputed many of the facts and the claims based thereon. During the discovery period, counsel for each of the defendants requested that the plaintiffs permit them to conduct ex parte interviews with the decedent's treating healthcare providers, asking them to either sign a medical authorization form that complied with the Health Insurance Portability and

4

Accountability Act of 1996 ("HIPAA")[4] or agree to a consent order that would allow

such ex parte interviews, but the plaintiffs refused the requests.

Then, in December 2010, the defendants filed a motion for a QPO, pursuant to

HIPAA,[5] asking the trial court to permit their counsel to conduct ex parte interviews

[4] HIPAA "authorized the Secretary of the Department of Health and Human Services to promulgate rules and regulations which would ensure the privacy of patients' medical information." (Citation omitted.) *Moreland v. Austin*, 284 Ga. 730, 731 (670 SE2d 68) (2008). The resulting regulations "prohibit healthcare providers from disclosing protected health information, whether 'oral or recorded in any form or medium,' unless the providers comply with the Secretary's rules and regulations." (Footnote omitted.) Id. See also 45 CFR § 160.103 ("Health Information means any information, whether oral or recorded in any form or medium, that . . . [i]s created or received by a health care provider . . . [and relates] to the past, present, or future physical or mental health or condition of an individual [or] the provision of health care to an individual[.]").

[5] 45 CFR § 164.512 (e) (1) provides, in relevant part, as follows:

A covered entity may disclose protected health information in the course of any judicial or administrative proceeding: (i) In response to an order of a court or administrative tribunal, provided that the covered entity discloses only the protected health information expressly authorized by such order; or (ii) In response to a subpoena, discovery request, or other lawful process, that is not accompanied by an order of a court or administrative tribunal, if . . . The covered entity receives satisfactory assurance . . . from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order that meets the requirements of paragraph (e)(1)(v) of this section.

5

with the decedent's treating healthcare providers so they could discuss information that they contend is relevant to the decedent's medical conditions that the plaintiffs placed in issue in this suit.[6] See *Moreland v. Austin*, 284 Ga. 730, 733-734 (670 SE2d

> . . . (iv) [A] covered entity receives satisfactory assurances from a party seeking protected health information, if the covered entity receives from such party a written statement and accompanying documentation demonstrating that: (A) The parties to the dispute giving rise to the request for information have agreed to a qualified protective order and have presented it to the court or administrative tribunal with jurisdiction over the dispute; or (B) The party seeking the protected health information has requested a qualified protective order from such court or administrative tribunal.

See 45 CFR § 164.512 (e) (1) (v) ("[A] qualified protective order means, with respect to protected health information requested under paragraph (e)(1)(ii) of this section, an order of a court or of an administrative tribunal or a stipulation by the parties to the litigation or administrative proceeding that: (A) Prohibits the parties from using or disclosing the protected health information for any purpose other than the litigation or proceeding for which such information was requested; and (B) Requires the return to the covered entity or destruction of the protected health information (including all copies made) at the end of the litigation or proceeding."); see also 45 CFR § 160.103 ("Covered entity means: (1) A health plan. (2) A health care clearinghouse. (3) A health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter.").

[6] See OCGA § 24-9-40 (a) (No physician shall be required to release any medical information concerning a patient except when authorized or required to by law, when authorized by the patient, or when ordered by a court; however, the "privilege shall be waived to the extent that the patient places his or her care and

68) (2008) (holding that HIPAA preempts OCGA § 24-9-40 (a) "with regard to ex parte communications between defense counsel and plaintiff's prior treating physicians[,] because HIPAA affords patients more control over their medical records when it comes to informal contacts between litigants and physicians.[7] . . .

---

treatment or the nature and extent of his or her injuries at issue in any civil or criminal proceeding.").

[7] In *Moreland*, the Supreme Court of Georgia explained that, under OCGA § 24-9-40 (a),

> once a patient files suit and puts his medical condition in issue, his treating physicians can then disclose his medical records and defendant's lawyer can informally contact those physicians and orally communicate with them about plaintiff's medical condition. HIPAA, on the other hand, prevents a medical provider from disseminating a patient's medical information in litigation, whether orally or in writing, without obtaining a court order or the patient's express consent, or fulfilling certain other procedural requirements designed to safeguard against improper use of the information. In other words, HIPAA requires a physician to protect a patient's health information, unless the patient is given reasonable notice and an opportunity to object. Georgia law stands in sharp contrast: it facilitates and streamlines the litigation process; it was not designed to protect a patient's private health information in the course of oral communications between the patient's physicians and defense counsel. It follows that HIPAA is more stringent and that it governs ex parte communications between defense counsel and healthcare providers.

7

[Consequently,] in order for defense counsel to informally interview plaintiff's treating physicians, they must first obtain a valid authorization [from the plaintiff[8]], [a] court order[,] or otherwise comply with [HIPAA's regulations].") (citations omitted).

In addition to the motion for a QPO, the defendants presented a motion in the alternative (to be considered if the trial court denied the QPO motion), asking the court "to place the *same requirements* on Plaintiff[s] and Plaintiff[s'] counsel that may

(Citations omitted.) *Moreland v. Austin*, 284 Ga. at 733. See also 42 USCA § 1320d-7 (HIPAA's general preemption clause); 45 CFR § 160.203 (b) ("A standard, requirement, or implementation specification adopted under this subchapter that is contrary to a provision of State law preempts the provision of State law. This general rule applies, except if . . . [t]he provision of State law relates to the privacy of individually identifiable health information and is more stringent than a standard, requirement, or implementation specification adopted under [HIPAA's privacy rule].").

[8] According to the Supreme Court,

[a]lthough defense counsel can engage in such discussions if a plaintiff gives his or her consent, it must be clear that the plaintiff consented to ex parte oral communications. We will not presume a plaintiff consented to such communications simply because the plaintiff did not object when defendant sought plaintiff's medical records pursuant to a subpoena or request for production of documents.

(Footnote omitted.) *Moreland v. Austin*, 284 Ga. at 735.

be placed upon Defendants' counsel in interviewing [the decedent's] treating medical providers[,]" arguing that it would provide them "equal access and a level playing field in interviewing [the decedent's] treating medical providers, who are ultimately third party fact witnesses that should be equally available to all parties to this case." (Emphasis in original.)

The trial court conducted a hearing on the motions, during which the defendants allegedly submitted a proposed QPO allowing them to conduct the ex parte interviews.[9] The proposed QPO stated, in relevant part, that the defendants and/or their counsel "are permitted to engage in ex parte communications with [the decedent's] healthcare providers." It limited such communications as follows:

> Ms. Ehrlich's healthcare providers are *ONLY* permitted to discuss "information [that] is relevant to the medical conditions[s] the litigant has placed in issue in the legal proceeding." "Relevant" information is *strictly* limited to the following:

---

[9] The record shows that the defendants attached a proposed QPO as "Exhibit B" to their December 2010 motions. Then, after the trial court denied the motions, the defendants filed a "revised" QPO to replace the earlier one, along with a document stating that they had provided the trial court with a "courtesy copy" of the revised QPO during the motion hearing, which, as noted above, was not transcribed. The document also stated, however, that the revised QPO "had not otherwise been filed into the [c]ourt record, and Defendants are uncertain whether [the trial court] filed it into the [c]ourt record during the oral argument." Even so, it is the "revised" QPO that the defendants claim, on appeal, that the trial court erroneously denied.

1) any and all medical care she received from August 28, 2008 until her death on November 15, 2008;

2) any and all medical care involving skin care related to bedsores, decubitus ulcers, skin lesions, abscesses, or other skin breakdowns, including preventive care for same and/or Ms. Ehrlich's propensity to develop same; [and]

3) any and all medical care for co-morbidities that could affect the life expectancy of Francine Ehrlich.

(Footnote omitted; emphasis in original.) In compliance with HIPAA, the proposed QPO expressly prohibited the defendants or their counsel from using or disclosing the decedent's protected health information for any purpose other than this litigation, and it required them to either return the protected health information (including all copies made) to the healthcare providers or destroy it at the end of this litigation.[10] It then listed six healthcare providers: four physicians who treated the decedent's wound at Northside or Kennestone Hospitals, and a physician and a nurse practitioner who allegedly treated the decedent at the nursing home.[11] Finally, the QPO stated that,

---

[10] See footnote 5, supra.

[11] None of the named providers are parties to the instant suit, nor are they agents or employees of the defendants.

10

"[b]y receipt of a copy of this [QPO], the medical provider to be interviewed shall be made aware of the fact that the *interview is at the request of the defendant[s], not the patient-plaintiff[s], and is for the purpose of assisting defense counsel in the litigation*" and that "*the health care provider's participation in the interview is voluntary*."[12] (Emphasis in original.)

During the hearing, the defendants urged the trial court to issue the proposed QPO, arguing that they believed it complied with the requirements for permitting the oral or written disclosure of otherwise protected health information under HIPAA, as well as the Supreme Court of Georgia's ruling in *Baker v. Wellstar Health Systems*, 288 Ga. 336 (703 SE2d 601) (2010).[13] Following the hearing, however, the trial court

---

[12] Healthcare providers are free to decide whether or not to cooperate with defense counsel. HIPAA-compliant authorizations and HIPAA court orders cannot force a health care professional to communicate with anyone; they merely signal compliance with HIPAA and the Privacy Rule as is required before any use or disclosure of protected health information may take place.

(Citation and punctuation omitted.) *Moreland v. Austin*, 284 Ga. at 731, n. 5.

[13] See Division 2 (b), infra, regarding the proposed QPO's compliance with the *Baker* requirements.

11

denied both the motion for a QPO and the motion in the alternative. Although the trial court did not rule on whether the proposed QPO complied with the applicable law cited above, it expressly found no merit in the defendants' argument that such rulings would violate their "constitutional right to a fair trial." It also reminded the defendants that they may still "avail themselves of Georgia's standard discovery procedures in order to secure [medical] records, information, and testimony from [the] decedent's treating healthcare providers."

1. On appeal, the defendants raise two related allegations of error, to wit, that the trial court's denial of their motion for a QPO and their motion in the alternative violated their constitutional rights to equal protection and due process. As explained below, we find these contentions to be without merit.

(a) As an initial matter, the defendants argue that this Court should apply a "strict scrutiny" analysis in deciding whether the trial court violated their constitutional rights by denying their motions. Under the strict scrutiny test, a statute that infringes on a person's fundamental constitutional rights is "deemed unconstitutional unless the State can demonstrate it is justified by a compelling interest and is narrowly drawn to serve that interest." (Citation omitted.) *Final Exit Network v. State*, 290 Ga. 508, 509 (2) (722 SE2d 722) (2012) (addressing the

12

constitutionality of a content-based statute restricting speech). "Unless governmental action infringes upon a fundamental right or the complaining party is a member of a suspect class, [however,] a substantive due process or equal protection challenge is examined under the 'rational basis' test." (Citation omitted.) *Favorito v. Handel*, 285 Ga. 795, 796 (1) (684 SE2d 257) (2009) (holding that, even though the right to vote is a fundamental constitutional right, some laws establishing the manner of voting are subject to review under the rational basis test). See also *Nichols v. Gross*, 282 Ga. 811, 813 (653 SE2d 747) (2007) (reviewing the constitutionality of a medical malpractice statute of repose under the rational basis test).

Here, the defendants do not argue that, pursuant to a strict scrutiny analysis, HIPAA or any other federal or state statute is per se unconstitutional and invalid,[14] nor

---

[14] In fact, we note that, although the defendants originally filed an application for interlocutory appeal from the trial court's orders in the Supreme Court of Georgia, the Supreme Court transferred the application to this Court based upon its finding that it lacked subject matter jurisdiction. According to the Supreme Court,

> this appeal does not involve the construction of a treaty or of the Constitution of the State of Georgia or of the United States and *does not draw into question the constitutionality of a law, ordinance, or constitutional provision*. Instead, it involves the mere application, in a general sense, of unquestioned and unambiguous provisions of the Constitution to a given state of facts.

do they argue that the trial court improperly relied on the relevant provisions of HIPAA or the holdings of *Moreland* or *Baker* when ruling on their motions. Further, the defendants have failed to show that they are members of a "suspect class" whose rights were infringed upon by the trial court's rulings.

Instead, they argue that the trial court's orders violated their fundamental right to a fair trial by preventing them from conducting ex parte interviews with the decedent's treating healthcare providers, interviews which they characterize as an inherent and necessary part of effective trial preparation. According to the defendants, if they are prohibited from conducting the ex parte interviews, they will be unable to obtain the affidavits of those healthcare providers; will be unable to obtain medical narratives pursuant to OCGA § 24-3-18[15]; will be unable to protect their "attorney

(Citations and punctuation omitted; emphasis supplied.)

[15] Under OCGA § 24-3-18,

(a) Upon the trial of any civil case involving injury or disease, any medical report in narrative form which has been signed and dated by an examining or treating licensed medical doctor . . . shall be admissible and received in evidence insofar as it purports to represent the history, examination, diagnosis, treatment, prognosis, or interpretation of tests or examinations, including the basis therefor, by the person signing the report, the same as if that person were present at trial and testifying as a

14

work product"[16]; will be unable to "prepare [the decedent's treating healthcare providers] for their trial testimony"; and will be subjected to greater trial preparation expenses. As a result, they argue that they

<hr>

witness; provided, however, that such report and notice of intention to introduce such report must first be provided to the adverse party at least 60 days prior to trial. . . . Any adverse party may object to the admissibility of any portion of the report, other than on the ground that it is hearsay, within 15 days of being provided with the report. Further, any adverse party shall have the right to cross-examine the person signing the report and provide rebuttal testimony. The party tendering the report may also introduce testimony of the person signing the report for the purpose of supplementing the report or otherwise.

(b) The medical narrative shall be presented to the jury as depositions are presented to the jury and shall not go out with the jury as documentary evidence.

We note that this statute is an exception to the hearsay rule that authorizes a party to admit a medical narrative at trial in lieu of (or in addition to) producing the author of the report as a sworn witness at trial. *Bell v. Austin*, 278 Ga. 844, 844-845 (1) (a) (607 SE2d 569) (2005). Thus, it does not address the *substance* of evidence presented at trial, but simply the *manner* in which the evidence is presented.

[16] We note that the privilege of shielding confidential attorney work product in Georgia is not a due process right, but is, instead, a product of statutory law. See OCGA § 9-11-26 (b) (3) (work product protection extends to "documents and tangible things containing [the attorney's] mental impressions").

15

will be forced to call [the decedent's] treating medical providers to the witness stand and blindly hope that [the providers] remember the treatment at issue, the issues relevant to their testimony, and the specific pages of their medical records containing pertinent information. [The defendants'] prohibition from preparing these witnesses for trial will result in scattered, disjointed trial testimony that reflects poorly on the witnesses and the [defendants] in the eyes of the jury, especially compared to the polished, succinct testimony of medical providers prepared for their trial testimony by [the plaintiffs].

Despite presenting such an impassioned argument outlining the potential dire consequences of an adverse ruling from this Court, however, the defendants have failed to support it with any evidentiary or legal authority, nor have they shown that these alleged consequences cannot be avoided by utilizing the other discovery methods and trial preparation techniques that remain available to them. Instead, this argument constitutes mere speculation and conjecture about possible future events that cannot fulfill their burden of demonstrating harm by the record. See *McConnell v. State*, 263 Ga. App. 686, 689 (3) (b) (589 SE2d 271) (2003) ("Harm cannot be shown by mere speculation and conjecture unsupported by the record.") (punctuation and footnote omitted).

16

In addition, these alleged consequences of the trial court's order lack merit because the defendants have failed to support their assertions that the ex parte interviews are, in fact, necessary for them to obtain either affidavits or medical narratives from the healthcare providers[17] or to protect their work product.[18] Nor have they shown why they need to meet with the healthcare providers ex parte in order to "prepare" them for their trial testimony,[19] especially since the providers are not parties

---

[17] It is undisputed that the defendants have access to the decedent's relevant medical records.

[18] Indeed, the questions posed by the defendants' counsel to the non-expert witnesses (the third party providers) and the answers thereto do not constitute attorney work product, and the fact that the attorneys intend to pose their questions to the third party providers implicates their waiver of work product protection. See OCGA §§ 9-11-26 (b) (3) ("[T]he court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation[.]"); 24-9-24 (An attorney shall not disclose the advice or counsel he may give to his client, nor any communications between the client and the attorney.); see also *McKesson Corp. v. Green*, 279 Ga. 95, 96 (1) (b) (610 SE2d 54) (2005) (noting that the "prevailing rule is that disclosure [of information] to an adversary, real or potential, forfeits work-product protection") (citation and punctuation omitted).

[19] See *Baker v. Wellstar Health Systems*, 288 Ga. at 339 (3) (a) (outlining some of the dangers of ex parte interviews of a plaintiff's healthcare providers by the defendant's counsel, including "the potential for unwarranted probing into matters irrelevant to the litigation[,] yet highly sensitive and possibly prejudicial to the patient-plaintiff," and "the potential for defense counsel to influence the health care provider's testimony, unwittingly or otherwise, by encouraging solidarity with or arousing sympathy for a defendant health care provider.").

to the litigation, are not the defendants' expert witnesses, are not agents or employees of the defendants or represented by their attorneys, were in a confidential patient-physician relationship with the decedent at the time they obtained her medical information, and have an ongoing fiduciary duty to the decedent (and, by extension, her estate's representative) to protect that confidential information to the extent required under federal and state law. Finally, the defendants have failed to make any showing that the additional expenses allegedly associated with the other discovery methods that are readily available to them present a financial hardship to the extent that such hardship outweighs the decedent's ongoing, legally protected right to the confidentiality of her entire medical history (except to the extent that it is directly related to medical condition at issue here) or the risk of the intentional or inadvertent discovery of such protected information.

Accordingly, we reject as without merit the defendants' argument that, because the trial court's denial of their motions allegedly violates their constitutional right to a fair trial, the applicable standard of review in this case is strict scrutiny.

(b) The defendants contend that the trial court violated their equal protection rights by denying their QPO motion and their motion in the alternative, arguing that it deprived them of "*equal access* to interview [the decedent's] relevant treating

18

medical providers." (Emphasis supplied.) It is axiomatic that, while "[t]he Georgia and U. S. Constitutions require government to treat similarly situated individuals in a similar manner," it is also true that the "person who is asserting the equal protection claim has the burden to establish that he is similarly situated to members of the class who are treated differently from him. If the person asserting the violation cannot make the foregoing showing, there is no need to continue with an equal protection analysis." (Citation and punctuation omitted.) *Dunn v. State*, 286 Ga. 238, 242 (2) (686 SE2d 772) (2009).

In this case, the defendants argue that the trial court's orders denying their counsel "the right to conduct ex parte interviews of treating medical providers, while simultaneously permitting [the plaintiffs'] counsel to do so, creates two classifications among similarly situated litigants. This inequality exists even though it is axiomatic that the parties to litigation stand equal before the law." The defendants, however, have failed to cite to any legal authority to support this broad assertion; they have also failed to cite to any evidence or legal authority that supports a finding that they are "similarly situated" to the plaintiffs in any way that is significant to an equal protection analysis, nor does the record support such a finding.

19

Instead, the record shows that the plaintiffs, as the surviving adult children of the decedent and/or the administrator of the decedent's estate, brought wrongful death and medical malpractice claims to recover for the decedent's injuries and death. It is axiomatic that the plaintiffs are *only* authorized to do so because the decedent, who had a privileged, confidential relationship with her healthcare providers at the time they obtained the information at issue here, is no longer alive and able to represent her own interests in the medical malpractice action. Thus, the plaintiffs are not only representing *their* interests in recovering for the loss of their mother,[20] but the estate administrator is *also* representing *the decedent's interests* in recovering for her pain and suffering on behalf of her estate.[21]

Moreover, contrary to the defendants' assertions, the decedent's treating healthcare providers are not "independent third party fact witnesses" who must be

---

[20] See OCGA § 51-4-2 (a) (a wrongful death action may be brought by the decedent's children if there is no surviving spouse).

[21] See OCGA §§ 51-1-27 (authorizing recovery for medical malpractice); see also OCGA §§ 9-2-21 ("An action for a tort shall, in general, be brought in the name of the person whose legal right has been affected."); 9-11-17 (a) (Every cause of action shall be prosecuted by the real party in interest, which may include the executor or administrator of an estate.); 53-7-1 (general powers and duties of an estate's representative); 53-7-45 (authorizing the estate's personal representative to litigate claims in favor of the estate).

20

made equally available to all of the parties. Instead, the providers gathered the decedent's medical information – including the information the defendants are seeking – while owing a fiduciary duty[22] to the decedent and while bound by duties of confidentiality imposed by federal and state law, as discussed above. Thus, unlike a *true* independent third party fact witness who can only testify to his or her actual observations of the event at issue, such as a pedestrian who just happened to witness an automobile collision between two people he or she did not know, it is highly probable that the healthcare providers in this case possess specific and privileged medical information collected from the decedent herself, as well as from the medical records of others, that is entirely unrelated to the medical condition at issue here.

Accordingly, we conclude that the defendants have failed to carry their burden of demonstrating that the trial court violated their equal protection rights by denying the orders at issue.

(c) Although the defendants separately enumerate as error their allegation that the trial court violated their due process rights by denying them a fair trial, the arguments and authority they offer in support of this contention are the same as those

---

[22] See *Cox v. Athens Regional Med. Center*, 279 Ga. App. 586, 593 (4), n. 14 (631 SE2d 792) (2006) (noting that, "ordinarily, physicians owe a fiduciary duty to their patients with respect to the care given") (citation omitted).

we have found to be without merit in Division 1 (a), supra. Accordingly, there is nothing else for this Court to review on this issue.

In sum, we conclude that the defendants have failed to articulate or support a successful constitutional challenge to the trial court's rulings in this case.

2. Still to be decided, however, is whether the defendants are correct in asserting that trial court in this case was *required* to either issue their proposed QPO or grant their motion in the alternative, or whether the trial court was authorized to use its *discretion* to decide whether to issue the QPO after considering the specific circumstances presented here.

(a) In their appellate brief, the defendants explicitly request that this Court establish new legal precedent, as follows:

> Carefully crafted [Q]ualified [P]rotective [O]rders specifying precise parameters within which ex parte interviews may be conducted should typically be granted, but when Qualified Protective Orders are denied or provide unequal access to treating medical providers, the trial court should place the same limitations on plaintiff's counsel as on defendant's counsel.

(Punctuation and footnote omitted.) In other words, the defendants are asking this Court to establish a new rule stating that, as long as a defendant's proposed QPO

22

seeking ex parte access to the plaintiff's treating healthcare providers complies with HIPAA and applicable Georgia law, the trial court *must either grant it or prohibit the plaintiff's counsel from conducting such interviews*, regardless of the underlying circumstances of the case, thereby removing the court's discretion in such matters.

(i) The record shows, however, that the defendants have only recently embraced its effort to have this Court establish this new precedent. Specifically, the record shows that this appeal was previously docketed in this Court as Case No. A11A1834 on May 27, 2011. In a brief they filed in that case, the defendants (as the appellants) made the following declaration:

> Contrary to Appellees' assertion, Appellants did not argue that once a QPO is sought, the trial court "should be stripped of its discretion" and enter QPOs "as a matter of course," tantamount to a "check the box" scheme. *Appellants readily acknowledged that Baker vests the trial courts with the discretion to decide whether to enter a QPO permitting ex parte communications with treating medical providers*. This is *implicitly acknowledged* by Appellants' Motion in the Alternative, which sought to have restrictions placed on Appellees' counsels' access to Ms. Ehrlich's treating medical providers *in the event the trial court exercised its discretion and denied Appellants' underlying Motion for a QPO*.

(Emphasis in original and supplied in part.)

23

Before deciding the merits of that appeal, however, this Court remanded the case to the trial court to resolve an alleged conflict of interest of counsel. The trial court addressed and resolved that single issue, and it is undisputed that nothing occurred in the trial court that materially impacted the orders or the issues that the defendants had already raised on appeal. This case was then re-docketed as the instant appeal, and the parties again submitted briefs addressing "the original issues" raised on appeal. It is in their new appellate brief, however, that the defendants have reversed course and now argue, *for the first time*, that trial courts lack discretion and must either issue QPOs that comply with HIPAA and Georgia law or prohibit plaintiffs from communicating ex parte with their treating healthcare providers, *regardless* of the facts and circumstances distinguishing individual cases.

It is axiomatic, however, that "our appellate courts are courts for the correction of errors of law committed in the trial court. . . . Therefore, absent special circumstances, an appellate court need not consider arguments raised for the first time on appeal." (Citation and punctuation omitted.) *Safe Shield Workwear v. Shubee, Inc.*, 296 Ga. App. 498, 500-501 (2) (675 SE2d 249) (2009).

(ii) Moreover, even if this Court was willing to embrace the new precedent proposed by the defendants, we are powerless to do so, because it conflicts with the

24

Supreme Court of Georgia's ruling in *Baker*. In *Baker*, the Court discussed the inherent dangers of ex parte interviews such as those sought by the defendants herein and the minimal legal requirements for QPOs authorizing such interviews.[23] *Baker v. Wellstar Health Systems*, 288 Ga. at 339 (3) (a), (b). It then emphasized that, before trial courts issue such QPOs, they

> should consider whether the circumstances – including any evidence indicating that ex parte interviews have or are expected to stray beyond their proper bounds – warrant requiring defense counsel to provide the patient-plaintiff with prior notice of, and the opportunity to appear at, scheduled interviews or, alternatively, requiring the transcription of the interview by a court reporter at the patient-plaintiff's request.

(Citations omitted.) Id. at 339-340 (3) (b). In so ruling, the Court implicitly, if not explicitly, ruled that trial courts retain the discretion to decide whether to issue such QPOs (and, if they do so, to decide whether to include additional procedural protections) *even if* the QPOs met the minimal legal requirements and *after* considering the individual facts and circumstances surrounding each case.[24] Id.; see

---

[23] See footnote 19, supra, and Division 2 (b), infra.

[24] We note that this conclusion is consistent with OCGA § 9-11-26 (c), which provides that the court "may" issue a protective order for good cause shown, as well as the general rule that "the conduct of discovery is within a trial court's broad discretion." (Footnote omitted.) *Exxon Corp. v. Thomason*, 269 Ga. 761, 763 (3) (504

also *Moreland v. Austin*, 284 Ga. at 735 (holding that the trial court acted "well within [its] discretion" when issuing an order that allowed defense counsel to interview the decedent's treating physicians, but only after giving the plaintiff notice and providing the opportunity for plaintiff's counsel to be present during the interviews).

Thus, pretermitting whether this issue was preserved for appellate review, we are bound by the Supreme Court's ruling in *Baker*[25] and, consequently, we reject the defendants' request to adopt a new rule that effectively strips trial courts of all discretion in deciding whether to issue QPOs that authorize the type of ex parte interviews sought in this case.[26]

---

SE2d 676) (1998).

[25] See Ga. Const. of 1983, Art. VI, Sec. VI, Par. VI ("The decisions of the Supreme Court shall bind all other courts as precedents.").

[26] Cf. *Arby's Restaurant Group v. McRae*, __ Ga. __ (Case No. S12G0714, decided November 5, 2012) (In a workers' compensation case, the Supreme Court ruled that, because HIPAA specifically exempts from its requirements disclosures that are made in accordance with state workers' compensation laws, HIPAA's privacy provisions do not preempt Georgia law on the subject of ex parte communications with the plaintiff's treating physicians in workers' compensation cases. As a result, an employee who files a workers' compensation claim is required, under OCGA § 34-9-207, to authorize his or her treating physician to engage in ex parte communications with his or her employer or an employer representative in exchange for receiving benefits for a compensable injury. In so ruling, the Court distinguished its holding in *Baker*, stating that, because *Baker* was a medical malpractice case, the disclosure was subject to HIPAA's privacy requirements.).

(b) Given our holdings thus far, the only remaining issue is whether the trial court in this case abused its discretion in denying the defendants' motion for a QPO. Because we find that the proposed QPO was insufficiently limited in scope to comply with the Supreme Court of Georgia's ruling in *Baker*, we find no abuse of discretion.

In *Baker*, the Supreme Court considered whether a trial court properly issued a QPO allowing the defendant's counsel to engage in ex parte communications with the plaintiff's "treating physicians and other healthcare providers" and permitted them to discuss the plaintiff's "medical conditions and any past, present, or future care and treatment[.]" *Baker v. Wellstar Health Systems*, 288 Ga. at 337-338 (1). Although the Court found that the QPO complied with the applicable HIPAA privacy regulations, id. at 338 (1), it warned that, while "the purpose of [those regulations] is to protect and enhance the rights of consumers by providing them access to their health information and controlling the inappropriate use thereof[,]" there was a "gaping loophole in the procedural protections afforded by HIPAA in the context of litigation." (Citation and punctuation omitted.) Id. at 338-339 (3) (a). According to the Court,

the dangers associated with ex parte interviews of health care providers are numerous, including (1) the potential for unwarranted probing into matters irrelevant to the litigation yet highly sensitive and possibly prejudicial to the patient-plaintiff; (2) the potential for disclosure of

27

information, such as mental impressions not documented in the medical record, that the health care provider has never actually communicated to the patient-plaintiff; and (3) the potential for defense counsel to influence the health care provider's testimony, unwittingly or otherwise, by encouraging solidarity with or arousing sympathy for a defendant health care provider.

Id. at 339 (3) (a). Given these concerns, the Court ruled that, even if the QPO at issue complied with HIPAA, further analysis of the QPO was required to ensure that it complied with Georgia law, because, although "HIPAA preempts Georgia law in its imposition of procedural requirements, the substantive right to medical privacy under Georgia law endures. See *King v. State*, 272 Ga. 788 (1) (535 SE2d 492) (2000) (Georgia Constitution guarantees right of medical privacy)." Id. at 338 (2).

After so considering the QPO at issue, the Court ruled that the scope of information that the healthcare providers could disclose to the defendant's counsel pursuant to the QPO was too broad and that the QPO "should have limited [the defendant's] inquiry to matters relevant to the medical condition Baker has placed at issue in this proceeding[, pursuant to OCGA § 24-9-40 (a)]. Without this limitation, the qualified protective order must be considered deficient." Id.

The Supreme Court then delineated the following requirements that trial courts must address (in addition to the HIPAA requirements) in order to properly issue QPOs authorizing ex parte interviews:

[T]rial courts should state with particularity: (1) the name(s) of the health care provider(s) who may be interviewed; (2) the medical condition(s) at issue in the litigation regarding which the health care provider(s) may be interviewed; (3) the fact that the interview is at the request of the defendant, not the patient-plaintiff, and is for the purpose of assisting defense counsel in the litigation; and (4) the fact that the health care provider's participation in the interview is voluntary.

(Citations omitted.) Id. at 339 (3) (b). The Supreme Court urged the trial courts to issue "carefully crafted orders specifying precise parameters within which ex parte interviews may be conducted," emphasizing that such orders "will serve to enforce the privacy protections afforded under state law and advance HIPAA's purposes while at the same time preserving a mode of informal discovery that may be helpful in streamlining litigation in this State." Id. at 340 (3) (b).

Applying the *Baker* analysis to the instant case, the proposed QPO appears to comply with the first, third, and fourth requirements. As for whether the proposed QPO properly limited the defendants to discussing only "the medical condition(s) at issue in the litigation" with the named healthcare providers, the record shows that, by

29

filing their complaint, the plaintiffs initiated a dispute as to the *cause, extent, treatment, and consequences of the decedent's wound*. Yet, the defendants' proposed QPO sought authorization to question the decedent's healthcare providers about "any and all medical care she received from August 28, 2008 until her death on November 15, 2008[.]" In other words, the defendants sought permission to question the providers about *all of the medical care the decedent received after she developed the wound*, even if it had absolutely no relevance to the cause, extent, treatment, or consequences of her wound. Further, the defendants sought authorization to question the providers about *"any and all medical care for co-morbidities that could affect [her] life expectancy[,]"* in other words, *every health problem she had ever experienced* that *might* have affected her life expectancy.

Thus, under the circumstances presented here, we conclude that the trial court was authorized to find that, pursuant to *Baker,* the proposed QPO failed to sufficiently limit the scope of the ex parte interviews sought by the defendants. Accordingly, we find no abuse of discretion in this case.

*Judgment affirmed. Andrews, and Boggs, JJ., concur.*