

# NUMBER 13-19-00500-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

TEXAS AUTO SALVAGE, INC.,
GARY HACK, AND DANIEL HACK,                                    Appellants,

v.

D D RAMIREZ, INC., DANNY RAMIREZ
RECYCLING, INC., SAN ANTONIO AUTO
& TRUCK SALVAGE, DANNY'S RECYCLING
& PRECIOUS METALS, LLC, DANNY'S
RECYCLING, INC., AND
DANIEL DELAGARZA RAMIREZ,                                      Appellees.

On appeal from the 37th District Court
of Bexar County, Texas.

# MEMORANDUM OPINION

Before Chief Justice Contreras and Justices Hinojosa and Silva

# Memorandum Opinion by Chief Justice Contreras

Appellants Texas Auto Salvage, Inc., et al. (collectively TASI)[1] sued appellees D D Ramirez, Inc., et al. (collectively DDR),[2] in a dispute concerning the parties' neighboring metal recycling facilities on Somerset Road in San Antonio. After a two-week trial, the jury found against TASI on all but one of its claims. The trial court then granted DDR's motion for judgment notwithstanding the verdict (JNOV) and issued a take-nothing judgment.

By five issues on appeal, TASI argues: (1) the trial court erred by denying injunctive relief; (2) the trial court erred by rendering JNOV on its public nuisance claim; (3 and 4) the trial court erred by excluding certain expert testimony; and (5) the evidence was factually insufficient to support the jury's rejection of its private nuisance claim. We affirm.[3]

## I. BACKGROUND

TASI filed suit in 2010 alleging defamation, business disparagement, invasion of privacy, and tortious interference with existing and prospective contracts. Its live petition, filed on January 1, 2017, added claims of public nuisance, private nuisance, abuse of process, malicious prosecution, unjust enrichment, and conversion. The petition alleged that DDR kept its three metal recycling yards "polluted, dirty, unkempt, and in a condition that violates city, state and federal rules, regulations and laws" and that this "had a detrimental impact on nearby businesses such as TASI," whose metal recycling yard is located across the street from one of DDR's facilities. The public nuisance claim was

---

[1] Appellants are Texas Auto Salvage, Inc.; Gary Hack; and Daniel Hack.

[2] Appellees are D D Ramirez Inc.; Danny Ramirez Recycling, Inc.; San Antonio Auto & Truck Salvage; Danny's Recycling & Precious Metals, LLC; Danny's Recycling, Inc.; and Daniel Delagarza Ramirez.

[3] This appeal was transferred to this Court from the Fourth Court of Appeals in San Antonio pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001.

based on common law principles as well as alleged violations of San Antonio's Code of Ordinances (the Municipal Code). TASI sought a declaratory judgment stating that: (1) DDR is in violation of Chapter 10 of the Municipal Code because it lacked the required certificate of occupancy; and (2) DDR is in violation of Chapter 16 of the Municipal Code because its facilities meet the definition of "public nuisance" provided in that ordinance.[4] TASI further requested temporary and permanent injunctions enjoining DDR from, among other things, "opening and operating" its metal recycling facilities "and continuing to violate city, state and federal rules, regulations and law" in doing so. DDR filed counterclaims for defamation, business disparagement, invasion of privacy, and tortious interference with existing and prospective contracts, as well as a claim that TASI committed arson by burning a car crusher at DDR's facility on July 21, 2011.

At trial, Daniel Hack testified that he and his father Gary own and operate TASI and Acme Auto Recycling, both located on Somerset Road. Originally, TASI was involved in salvaging cars to resell auto parts, but it now focuses exclusively on metal recycling. Hack knew Danny Ramirez, DDR's owner and operator, as a business associate. He stated that he sold Ramirez a car crusher for $50,000, when Ramirez was first entering the salvage and recycling business. Ramirez also loaned money to Gary Hack at times. Eventually, the relationship between Ramirez and the Hacks deteriorated. However, Hack denied that he or his father ever committed arson on DDR's property or paid or encouraged anyone else to do so.

Hack explained that the City of San Antonio (the City) regularly sends code

---

[4] TASI also sued the City of San Antonio and several City employees, alleging that the relevant Municipal Code provisions were being enforced in a discriminatory manner. Those claims were removed to federal court and eventually dismissed. Neither the City nor any of its employees are parties to this appeal.

enforcement officers to salvage and recycling yards such as TASI and DDR. Hack testified that, at one point, the City ordered TASI to close one of its buildings so that it could be brought up to code, and TASI had to work out of a tent for one year. Hack said TASI spent over $100,000 in improvements before the City granted TASI a certificate of occupancy allowing them to resume normal operations. He stated, however, that DDR's property contained several buildings which did not have valid certificates of occupancy. On one occasion, he observed that DDR's property was pumping dirty, oily water from a pipe underneath a fence into a storm drain on the public road.[5] He opined that code enforcement is left to the discretion of the individual code enforcement officers and "if they like you, they'll let you get away with it."

According to Hack, the Municipal Code requires salvage yards to remove all oil and other hazardous liquids from the salvaged vehicles and store the liquids in above-ground containers. Because there is always residual liquid waste, salvaged vehicle parts must be kept on concrete to ensure that the waste liquids do not seep into the ground. Hack said that if there is ever oil on the ground at TASI, it is immediately cleaned up. He said he is "very, very afraid of the repercussions" of having code violations because of his experiences with the City in the past. Hack explained that if he gets three "convictions" for code violations, then his license will be suspended for one year. He recalled that another recycling facility, Ascent, had far fewer code violations than DDR but was shut down by the City because of a zoning violation. Hack opined that DDR's facility has annual revenues of around $12 million, whereas TASI generates annual revenues of $20 million

---

[5] Two employees with the San Antonio Water System also testified that they saw oily water or sludge coming out through a fence on DDR's property into a storm drain.

4

to $30 million. He stated that his lawsuit "has never been about money" and he does not want DDR to go out of business; instead, he just wants DDR's yard to be "cleaned up."

On cross-examination, Hack conceded that TASI has been cited for at least sixty code violations, though none involved improper liquid storage or fires, and that there have been two explosions at TASI. Five or six years ago, TASI was fined $5,000 by the Texas Commission on Environmental Quality (TCEQ). Hack was not aware that Ascent had a smoke problem "so bad that they had to wear a mask just to get on the premises." He agreed that, as of the time of trial, the City had deemed DDR to be in compliance with the code.

Annette Rodriguez testified via deposition excerpts that she was a City code enforcement officer, tasked with inspecting metal salvage yards and recycling facilities from 1993 to 2010. She said she did not issue any citations to TASI. In 2010, she was part of an investigation into a "large amount of spilled automotive fluids" at DDR's facility. Rodriguez said that DDR was operating a salvage yard even though its certificate of occupancy permitted only auto sales and repair. She said Ramirez yelled at her and told her to get off his property when she cited him for code violations. She admitted that she asked Ramirez to help with repairs on her daughter's car and her sister's car, and Ramirez provided such assistance for free on at least one occasion; she said she was later "forced to resign" from her job because Ramirez told police that "he had done favors" for Rodriguez.[6]

Larry Garcia, who was offered as an expert on certificates of occupancy, testified

---

[6] Marc Castro, who oversaw code enforcement for the City, confirmed that Rodriguez would have been fired had she not resigned.

that he owned a metal recycling firm and did business with TASI as a rebar salesman. He said TASI had a water truck on its premises to reduce the prevalence of contaminated dust. Garcia said most salvage yards do not have water trucks because they are expensive. He said metal recycling facilities must apply for state and, in San Antonio, city permits. They must also ensure that their property is zoned "I-2" for heavy industry. In November of 2010, when Garcia visited DDR's facility to obtain a motor, he saw "oil all over the grass, all over the ground" as well as stagnant water. He saw cars being crushed and fluids "draining everywhere" from a pile of motors. Garcia requested that the city send a dangerous assessment response team (DART), but the request was denied. Garcia reviewed City inspection reports showing that, since 2008, DDR's facilities were repeatedly cited for code violations, including: ten times for failing to store waste liquids in covered above-ground containers; sixteen times for improper placement of salvage materials within ten feet of the surrounding fence; five times for allowing weeds and brush to overgrow; ten times for vehicles on the ground; and eight times for oil on the ground. DDR was also cited for failing to maintain a fire lane and operating a car crusher on the ground rather than on concrete.

Martin Ruiz, a code enforcement supervisor, testified via deposition excerpts that Rodriguez gave Ramirez notice to correct deficiencies at DDR, including "high weeds and oil" on the ground. Later, DDR was cited for a violation based on "used vehicle fluids on the soil" which appeared to be "runoff from the area where the car crusher is located." The violation states that the fluids caused "an impact to the soil." Ruiz replaced Rodriguez with Valdez but, "given the history" between Valdez and Ramirez, he later assigned Moises Zuniga and Christopher Torres to that property. Zuniga testified that he saw

6

"accumulated oil and gas" on DDR's property "a few times," including on February 21, 2012. Zuniga agreed that this is a fire hazard, but he said he used his discretion not to issue citations to Ramirez. He read from a TCEQ report which stated that soil samples taken from DDR contained elevated levels of lead and pollutant chemicals including trimethylbenzene and methylnaphthalene.[7] Another TCEQ report stated there were "fluids on the soil" which appeared to be "runoff from the area where the car crusher is located." Torres testified that, if he observes a deficiency on a property he is inspecting—including a noncompliant certificate of occupancy or environmental violations—he will issue a notice to correct; then, if the owner does not correct the problem within thirty days, it is within his discretion whether to issue a citation.

In deposition testimony recited at trial, Fernando Carmona testified he worked for Ramirez for three to four years stripping cars for parts. In 2006, "some guy named David" came to the recycling facility and said he "need[ed] to get rid" of a truck. According to Carmona, Ramirez "knew [the truck] was stolen" but directed him to pick it up and strip it. In Carmona's opinion, Ramirez was "purchasing stolen vehicles" "on a daily basis." Carmona agreed that he would "dump gas and oil" on the ground at Ramirez's direction. He said Ramirez told him DDR would not face repercussions for these actions because the inspectors are "all his friends" and "he had all the cops under his belt." He explained that, on one occasion, Ramirez painted a vehicle for a city employee for free. Carmona conceded that he has "done [his] share of crimes" but did not set fire to the car crusher at DDR.

---

[7] Stephen Forbes, who was offered by TASI as an expert on environmental law, testified that DDR's facility failed twenty-two percent of the items listed on inspection reports from 2015 to 2017. He said that trimethylbenzene and lead are cancer-causing chemicals.

Rhonda Reza testified via deposition excerpts that she inspected DDR's property on behalf of TCEQ in July of 2010 and took soil samples. She agreed that DDR was violating environmental regulations as of that time by "putting substantial amounts of chemicals on the ground." She investigated again in 2011, at which time there were no contaminants found near the car crusher. However, she observed liquids being stored in uncovered containers, which could have contributed to the spills at the site. She agreed that DDR was a "repeat offender" of environmental regulations.

Michael Uresti, a City employee, testified that his department tracks sixty-eight active salvage yards and has closed down fourteen through enforcement actions. Uresti stated that DDR had been issued certificates of occupancy allowing a salvage yard in 1984 and again in 1990. However, he told Ramirez that DDR's certificates needed to be updated because of a new code provision requiring each building on a property to have a certificate. He explained that such certificates do not expire but rather continue in effect until a new one is issued. Uresti agreed that, as of April 2018, DDR had been inspected only three times in the previous ten months. He agreed that DDR's certificates of occupancy were non-compliant from 2012 to 2018. Uresti testified that DDR had been issued six citations: three for lack of building permits and three for lack of compliant certificates of occupancy. However, he agreed that DDR was in compliance with the building permit and certificate of occupancy requirements as of the time of trial.

Following TASI's case-in-chief, DDR moved for directed verdict on grounds that TASI lacked standing to bring its public nuisance claim. The trial court conditionally denied the motion. Later, after both parties rested, the trial court directed a verdict in favor of DDR on TASI's common-law public nuisance claim, finding that TASI did not have

8

standing because it did not suffer "substantial harm" distinct from the harm suffered by the public. The jury then found as follows: (1) DDR did not intentionally or negligently create a private nuisance; (2) the City and/or its employees were derelict in their duties by not properly enforcing Chapters 10 and 16 of the Municipal Code with respect to DDR; (3) two of DDR's three facilities are public nuisances as defined in Chapter 16 of the Municipal Code; (4) $86,000 was a reasonable fee for TASI's attorneys in this case; (5) TASI did not commit arson; and (6) TASI did not commit invasion of privacy.

DDR subsequently filed a motion for JNOV contending that TASI's "statutory" public nuisance claim fails because: (1) TASI lacks standing because it did not suffer any special injury; (2) the Municipal Code does not create a private right of action based upon the City's alleged dereliction of duty; (3) the jury was not asked whether DDR intentionally or negligently caused a public nuisance, which is a controlling issue; (4) the jury questions did not present a proper claim for declaratory relief; and (5) there was no evidence to support the jury's findings that two of DDR's facilities met the Municipal Code's definition of public nuisance. The trial court granted the motion for JNOV. It then rendered final judgment providing that both parties take nothing by way of their respective claims and awarding no attorney's fees. TASI perfected this appeal.

## II. DISCUSSION

### A. Public Nuisance

TASI's first two issues argue that the trial court erred by granting DDR's motion for JNOV and by failing to grant TASI's request for permanent injunctive relief. Both issues relate to TASI's public nuisance claim. As noted, the trial court granted a directed verdict against TASI on its common-law public nuisance claim, and it granted JNOV against TASI

9

on that part of its public nuisance claim based on the Municipal Code.

### 1.    Standard of Review

After the jury returns its verdict, if there is no irreconcilable conflict in the jury's findings, the trial court is generally under a duty to render a judgment that conforms to that verdict. TEX. R. CIV. P. 301; *Cantu v. Hidalgo County*, 398 S.W.3d 824, 827 (Tex. App.—Corpus Christi–Edinburg 2012, pet. denied). However, a trial court may disregard a jury finding and enter a JNOV if (1) the jury finding is immaterial or (2) there is no evidence to support one or more of the jury findings on issues necessary to liability. *See* TEX. R. CIV. P. 301; *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994); *Williams v. Briscoe*, 137 S.W.3d 120, 124 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

A finding is "immaterial" when the corresponding question either: (1) should not have been submitted, (2) calls for a finding beyond the province of the jury, such as a question of law, or (3) was properly submitted but has been rendered immaterial by other findings. *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999); *Spencer*, 876 S.W.2d at 157.

To determine whether JNOV was proper on no-evidence grounds, we apply a legal sufficiency standard of review, considering the evidence in the light most favorable to the jury's verdict and indulging every reasonable inference that would support it. *See Tanner v. Nationwide Mut. Fire Ins.*, 289 S.W.3d 828, 830 (Tex. 2009); *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). The judgment will be upheld if there is less than a scintilla of evidence on at least one essential element of the plaintiff's claim. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (per curiam). We apply the same standard

when reviewing a trial court's directed verdict. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Flagstar Bank, FSB v. Walker*, 451 S.W.3d 490, 498 (Tex. App.—Dallas 2014, no pet.). Directed verdict or JNOV is also proper if the plaintiff fails to state a theory of recovery recognized at law. *Ordonez v. M.W. McCurdy & Co.*, 984 S.W.2d 264, 267 (Tex. App.—Houston [1st Dist.] 1998, no pet.).

### 2. Applicable Law

"A nuisance is a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities." *Barnes v. Mathis*, 353 S.W.3d 760, 763 (Tex. 2011) (per curiam). A public nuisance "is a condition that amounts to 'an unreasonable interference with a right common to the general public.'" *Jamail v. Stoneledge Condo. Owners Ass'n*, 970 S.W.2d 673, 676 (Tex. App.—Austin 1998, no pet.) (citing RESTATEMENT (2D) OF TORTS § 821B(1) (1979)). A public nuisance "affects the public at large" by "adversely affecting either the entire community, a public gathering place, or even a considerable portion of the citizenry." *Bolton v. Fisher*, 528 S.W.3d 770, 778 (Tex. App.—Texarkana 2017, pet. denied). On the other hand, "[a] private nuisance affects an individual or a small number of individuals rather than the public at large." *Mathis v. Barnes*, 377 S.W.3d 926, 930 (Tex. App.—Tyler 2012, no pet.).

The Texas Supreme Court has clarified that "the term 'nuisance' does not refer to the 'wrongful act' or to the 'resulting damages,' but only to the legal injury—the interference with the use and enjoyment of property—that may result from the wrongful act and result in the compensable damages." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 595 (Tex. 2016). Such an interference "qualifies as a nuisance—and

11

thus as a legal injury—only if the interference is 'substantial' and causes 'discomfort or annoyance' that is 'unreasonable.'" *Id.*

Standing, as a component of subject matter jurisdiction, is a constitutional prerequisite to the filing of suit. *See, e.g., Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex. 1993). The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a "justiciable interest" in its outcome. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). To have standing, a plaintiff must "allege some injury distinct from that sustained by the public at large." *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 8 (Tex. 2011); *Brown v. Todd*, 53 S.W.3d 297, 302 (Tex. 2001); *see Heckman*, 369 S.W.3d at 155 ("The plaintiff must be *personally* injured—he must plead facts demonstrating that he, himself (rather than a third party or the public at large), suffered the injury."); *City of San Antonio v. Stumburg*, 7 S.W. 754, 755 (Tex. 1888) (holding that "no action lies to restrain an interference with a mere public right, at the suit of an individual who has not suffered or is not threatened with some damage peculiar to himself").

Because standing is a component of subject matter jurisdiction, we review a plaintiff's standing de novo. *See Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004); *Brown*, 53 S.W.3d at 305; *see also United Food & Comm. Workers Int'l Union v. Wal-Mart Stores, Inc.*, No. 02-15-00374-CV, 2016 WL 6277370, at *8 (Tex. App.—Fort Worth Oct. 27, 2016, pet. denied) (mem. op.) ("[S]tanding to seek redress for the legal injury of nuisance is a jurisdictional issue that a trial court decides as a matter of law and we review de novo.").

### 3. Standing Under Municipal Code Chapter 16

Article VII of Chapter 16 of the Municipal Code, first enacted in 2012, regulates used automotive parts recyclers and metal recycling entities in San Antonio. *See* SAN ANTONIO, TEX., CODE OF ORDINANCES ch. 16, *available at* https://library.municode.com/tx/san_antonio/codes/code_of_ordinances (last visited Sept. 26, 2021). Among other things, the ordinance requires metal recyclers to obtain a license from the City on an annual basis. *Id.* § 16-205(a). It also requires metal recyclers to enclose their facilities on all sides with a fence that meets certain standards; to keep their facilities clear of weeds and brush; and to contain, store, and dispose of liquid waste in compliance with federal and state regulations. *Id.* at §§ 16-210.2(a), 16-210.3(d), (e). Section 16-210.7(b) states: "Conditions maintained in violation of this division which impact public health, safety, or welfare, or which deprive neighbors of their safe or peaceful use of nearby properties shall be unlawful and shall be deemed a public nuisance." *Id.* § 16-210.7(b).

TASI argues that Chapter 16 authorizes a suit for injunctive relief by a private plaintiff to redress a public nuisance when the City is "derelict in its duty to enforce its laws." TASI appears to contend that a plaintiff has standing to sue under this ordinance regardless of whether the plaintiff has suffered an injury distinct from that sustained by the general public. In support of this proposition, TASI cites several cases of remote vintage: *American Construction Co. v. Seelig*, 133 S.W. 429, 431 (Tex. 1911); *Bowers v. City of Taylor*, 24 S.W.2d 816, 817 (Tex. Comm'n App. 1930); *Boone v. Clark*, 214 S.W. 607, 611 (Tex. App.—Fort Worth 1919, writ ref'd); and *Ort v. Bowden*, 148 S.W. 1145, 1148 (Tex. App.—Galveston 1912, no writ). These cases do not establish that a party may obtain an injunction to stop the violation of an ordinance without complying with the

usual requirements to show standing to bring suit.

In *Seelig*, the Texas Supreme Court affirmed an injunction requiring the appellant to modify a fence he had built that blocked part of a public alley. 133 S.W. at 431. The appellant obtained written permission from a city commissioner to build the fence. *Id.* However, the Austin city charter provided that "no franchise or right to occupy or use the streets, highways, bridges or public places in the city shall be granted, renewed or extended, except by ordinance." *Id.* at 430. Because the permit was not an "ordinance," appellant did not have legal authority to build the fence, and the appellees were entitled to an injunction. *Id.* But there was never any question that the fence had caused appellees a distinct injury such as to bestow standing. *See id.* at 431 (noting that, because of the fence, "the right of the [appellees] to have the fronts of their buildings free from any obstruction from view or travel from both directions was impaired, and . . . it resulted in great damage to them pecuniarily in the loss of trade"). Indeed, the court affirmed the injunction explicitly "to prevent the injury that would be inflicted upon [appellees] in their business." *Id.*

In *Bowers*, the issue was whether the city of Taylor had authority to issue an ordinance "vest[ing] exclusive control" of part of a public street in a railroad company. 24 S.W.2d at 817. The court found that the ordinance was void because the city may not "surrender . . . its legislative powers and duties," and because of the "constitutional inhibition against irrevocable or uncontrollable grants of special privileges or immunities." *Id.* Further, the court rejected the argument made by the city and the railroad company that the plaintiff was entitled only to damages, not to injunctive relief. *Id.* at 818. The court found that injunctive relief was proper, but as in *Seelig*, there was no dispute that the

plaintiff had suffered a special injury from the enforcement of the ordinance so to as to give him standing. *See id.* at 816–18.

*Boone* concerned a lease granted by the commissioners of Wichita County, conveying the mineral rights on all public roads in the county. 214 S.W. at 607. The plaintiffs—owners of land adjacent to public roads—sought to have the lease declared void, and the trial court granted a temporary injunction restraining the use of the lands under the lease, which the appeals court affirmed. *Id.* The court specifically discussed whether the appellants had standing, noting that "a suit for relief from a public nuisance such as the proposed obstruction of the public highways of the county, cannot be maintained by individuals alone, suing as such, unless they can show some special injury to them which is not suffered by the public at large." *Id.* at 610–11. The court found that, if the allegations in plaintiffs' petition are true, "producing oil wells on the adjoining roads will drain the oil from such lands" and the plaintiffs "will sustain a special injury by reason of said wells not suffered by the public at large." *Id.* Thus, the plaintiffs had standing to sue. *Id.* Similarly, in *Ort*, there was no dispute that the plaintiffs had alleged facts establishing they suffered a special injury as a result of the Galveston Commercial Association's decision to build a park adjacent to their property. *See* 148 S.W. at 1148. The court observed that, "[w]hile it may be and doubtless is the duty of the city of Galveston to prevent or abate such purprestures as here complained of," and even though the plaintiffs could be compensated in damages, the plaintiffs were not precluded from seeking injunctive relief. *Id.*

TASI cites no other authority, and we find none, establishing that a governmental unit's "dereliction of duty" authorizes a plaintiff to bring suit regardless of whether a special

injury has resulted. Instead, we agree with DDR that a private plaintiff is not entitled to injunctive or declaratory relief to address the alleged violation of a municipal ordinance unless the plaintiff establishes special injury. *See Schmitz v. Denton Cty. Cowboy Church*, 550 S.W.3d 342, 359–60 (Tex. App.—Fort Worth 2018, pet. denied) (concluding, where defendant asserted that plaintiffs were seeking "do-it-yourself zoning enforcement," that plaintiffs lacked standing because "to declare and enjoin the [defendant]'s alleged violations of the Town's zoning ordinances is exclusively the province of a municipality" (citing TEX. LOC. GOV'T CODE ANN. § 211.012)); *GTE Mobilnet of S. Tex. Ltd. P'ship. v. Pascouet*, 61 S.W.3d 599, 621–22 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (concluding that "[u]nder the unambiguous language of [the local government code], only Bunker Hill may enforce its zoning ordinances"); *see also City of Mansfield v. Savering*, No. 02-19-00174-CV, 2020 WL 4006674, at *12 (Tex. App.—Fort Worth July 16, 2020, pet. denied) (mem. op.) (concluding that plaintiffs did not have a right to enforce an ordinance through a declaratory judgment claim).

The difference between TASI's common-law and "statutory" public nuisance claims is analogous to the difference between an ordinary common-law negligence claim and claim asserting negligence per se. To recover on an ordinary negligence claim, the plaintiff must produce evidence establishing that a duty exists based on the totality of the circumstances, whereas the existence of a duty is presumed in a negligence per se action because such duty is set forth in applicable legislation designed to prevent an injury to that class of persons to which the plaintiff belongs. *See Carter v. William Sommerville & Son, Inc.*, 584 S.W.2d 274, 278 (Tex. 1979) ("Negligence per se is a tort concept whereby a legislatively imposed standard of conduct is adopted by the civil courts as defining the

conduct of a reasonably prudent person."). Either way, the plaintiff must establish that it suffered damages as a proximate result of the defendant's breach. *See Thomas v. Uzoka*, 290 S.W.3d 437, 445 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Similarly, though Chapter 16 of the San Antonio Municipal Code imposes a multitude of requirements on metal recyclers, and though it defines "public nuisance" in a particular manner, it does not suggest that a plaintiff may obtain relief for violations of the ordinance merely because the city is "derelict" in its duty to enforce the law. The ordinance may be helpful in determining whether an "unreasonable interference" with a public right has been shown, but we reject TASI's first issue to the extent it argues that TASI had standing to sue under Chapter 16 without regard to the nature or extent of the injury suffered. We proceed to consider whether the trial court erred in its implicit determination that no special injury was shown.

### 4. Substantiality

TASI's second issue argues in part that the trial court erred because it applied the wrong standard to evaluate standing. Specifically, TASI contends that the trial court mistakenly required it to show evidence of a special injury which was "substantial." It argues that "there is no requirement in the law that the harm be 'substantial'" and that the trial court therefore erred in directing a verdict against TASI. We disagree. Arguably, to say that a plaintiff's special injury must be "substantial" to support standing in a public nuisance case is merely to acknowledge that such injury must manifest itself in reality, and must not be hypothetical or speculative. *See Substantial*, MERRIAM-WEBSTER ONLINE DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/substantial (last visited Oct. 13, 2021) (defining "substantial" as "consisting or related to substance"; "not

imaginary or illusory"). In any event, the requirement of substantiality is supported by the case law. *See Gardiner*, 505 S.W.3d at 595; *McQueen v. Burkhart*, 290 S.W.2d 577, 579 (Tex. App.—Austin 1956, no writ); *Ingram v. Turner*, 125 S.W. 327, 329 (Tex. App.—Austin 1910, writ ref'd); *see also Hatfield v. City of Port Arthur*, 598 S.W.2d 669, 672 (Tex. App.—Beaumont 1980, no writ); *Serafine v. Blunt*, No. 03-16-00131-CV, 2017 WL 2224528, at *5 (Tex. App—Austin May 19, 2017, pet. denied) (mem. op.). The trial court did not err in determining that a substantial special injury needed to be shown in order to establish standing.

### 5. Special Injury

TASI's first two issues principally argue that the directed verdict and JNOV were improper because the evidence showed that TASI had standing to sue based on the fact that it suffered special injury due to the nuisance on DDR's property. It contends that DDR's activities caused it to suffer special injury in two ways: (1) by harming its business interests, and (2) by harming its right to enjoy its property without risking harm to its health or safety.

In arguing that harm to its business interests caused special injury, TASI again relies on *Seelig* and *Boone*, and it also cites *Touchy v. Houston Legal Foundation*, 432 S.W.2d 690, 694 (Tex. 1968). As previously discussed, in *Seelig*, there was no dispute that the fence erected by the defendant had "resulted in great damage to [the plaintiffs] pecuniarily in the loss of trade, etc." 133 S.W. at 431. And in *Boone*, the court took as true the plaintiffs' allegation that wells drilled on the subject lease "will drain the oil from [the plaintiffs'] lands." 214 S.W. at 611. In *Touchy*, a group of attorneys filed suit seeking to enjoin a charitable foundation from engaging in practices which allegedly violated Texas

18

ethical rules applicable to attorneys. 432 S.W.2d at 691. The court summarily held that, "due to the special interest attorneys have in their profession, they have standing to maintain a suit to enjoin action which allegedly damages their profession." *Id.* at 694. However, the court's decision relied on case law establishing that attorneys "have a special privilege, franchise, and duty as officers of the court to protect the legal profession, the courts, and the administration of justice generally against the illegal and unprofessional conduct of others." *Id.* (citing *Depew v. Wichita Retail Credit Ass'n*, 42 P.2d 214, 217 (Kan. 1935)).

TASI contends that the evidence showed DDR's activities detrimentally affected the metal recycling business as a whole. It argues that, because of Ramirez's alleged misconduct, the City promulgated additional regulations on the metal recycling industry, which led to increased costs. It further argues that the City failed to enforce those regulations at DDR's facilities, meaning Ramirez was not burdened with those additional costs. TASI points to Hack's testimony that, if Ramirez's expenses for environmental compliance are lower, Hack would not be able to compete with DDR. Hack also testified that the City has "tried for many years to push [metal recycling facilities] out" of the city limits because of the perception that the industry contributed to pollution. However, TASI cites no evidence establishing that DDR's activities precipitated the imposition of any specific additional environmental regulations, or that TASI incurred any specific additional costs in endeavoring to comply with such regulations. Unlike in *Seelig* and *Boone*, the allegation that TASI suffered pecuniary harm as a result of the alleged nuisance was disputed and fully litigated. And unlike in *Touchy*, TASI did not have a "special privilege,

19

franchise, and duty" to protect the interests of its industry in general. *Cf. id.*[8]

TASI next argues that it sustained special injury because the nuisance harmed its right to enjoy its property without risk to health or safety. Citing *Dipp v. Rio Grande Produce, Inc.*, 330 S.W.2d 700 (Tex. App.—El Paso 1959, writ ref'd n.r.e.), TASI contends that "when a nuisance creates inconvenience or danger for those near the nuisance, that adverse impact is at least some evidence of special injury." In *Dipp*, the appeals court affirmed a summary judgment commanding the appellant to remove obstructions from an alley. *Id.* at 701. The court noted that the plaintiff, a leaseholder of a neighboring property, had standing because "he was an abutting user by virtue of the leasehold, and . . . he wished to use the north end of the alley," access to which was blocked by the obstruction. *Id.* The court observed that "an abutting owner . . . has rights not peculiar to the public at large, but which are particular and peculiar to himself by virtue of the relation of his lot to the alley which it abuts." *Id.*

In support of its argument that *Dipp* is analogous to the present case, TASI points to testimony by Zuniga that DDR allowed hazardous fluids to accumulate on its property and that contaminated wastewater flowed from DDR's property onto Somerset Road. TASI also points to the following testimony by its environmental expert, Afamia Elnakat, in arguing that air pollution from DDR's property caused an odor which "invaded the neighborhood":

> People don't realize that our ecosystem is connected. The one thing I love about this field is it doesn't know color. It doesn't know political borders. Just because we say this is the border and this is the neighbor and this is this, we breathe the same air. It doesn't matter. Pollution doesn't know these

---

[8] TASI proffered the expert testimony of Keith Fairchild to support its claim that it suffered pecuniary harm as a result of the nuisance on DDR's property. The trial court sustained DDR's objection to Fairchild's testimony on grounds that it was speculative. As further discussed *infra*, the trial court did not err in excluding this testimony, and so we do not consider it in our standing analysis.

limits. So when it comes down to how connected our environment is, we focus on the three mediums which is air, water and soil. People take soil samples not thinking about air and water. That's incorrect, okay? Because air deposits into soil. So clean soil can get dirty. And then clean water can go through that dirty soil and guess what, that water becomes dirty. That water evaporates and now the air is dirty again and it works the other way as well. Okay?

So the water, if it's dirty, can go through the soil. If the soil is clean now, the soil is dirty. And then when the soil dries up it disburses into the air and this dust particles become contaminated, so the air is dirty. It's all interconnected. And I see it, but it's—a person who is not in the field, they don't see how connected it is.

Elnakat's testimony established that, in general, water and air contaminants tend to disperse from the polluted area and will adversely affect other areas. However, she did not testify specifically that the pollution caused by DDR's activities produced effects which manifested themselves on TASI's premises. And while it is reasonable to infer from Elnakat's testimony that DDR's pollution caused some negative environmental effects beyond the borders of DDR's properties, it is not reasonable to infer from this testimony that TASI suffered a unique injury, distinct from that sustained by the public at large. *See Andrade*, 345 S.W.3d at 8; *Brown*, 53 S.W.3d at 302.

TASI cites several other cases where courts held the plaintiff had standing to enjoin a public nuisance situated in close proximity to the plaintiff, and it posits that "[p]roperty owners near a nuisance suffer a particularized or special harm from the effects of the nuisance, different from the public at large." *See Soap Corp. of Am. v. Reynolds*, 178 F.2d 503, 506 (5th Cir. 1949) ("[I]t is clearly settled that special injury may result to a person in proximity to it, although the injury may be occasioned by a public nuisance."); *Kjellander v. Smith*, 652 S.W.2d 595, 597 (Tex. App.—Tyler 1983, no writ) (finding plaintiffs had standing to seek an injunction requiring the removal of a fence which obstructed a public road and "seriously limit[ed] access to [the plaintiffs'] property");

21

*Heilbron v. St. Louis Sw. Ry. Co. of Tex.*, 113 S.W. 979, 980 (Tex. App. 1908, writ ref'd) (noting that plaintiffs, owners of property bordering a highway, would have standing to enjoin a nuisance on the highway if the evidence showed "an interference with travel"); *see also Spicewood Springs Rd. Tunnel Coal. v. Leffingwell*, No. 03-11-00260-CV, 2013 WL 2631750, at *2 (Tex. App.—Austin June 6, 2013, pet. dism'd) (mem. op.) (finding plaintiffs had alleged special injury where they "have already experienced excessive noise and dust" on their property as a result of proposed construction in adjacent parkland). But we reject TASI's implication that proximity to a public nuisance, alone, is enough to establish a special injury. *See Persons v. City of Fort Worth*, 790 S.W.2d 865, 867–69 (Tex. App.—Fort Worth 1990, no writ) (finding no special injury from the "erection of certain facilities and the expansion of the City zoo located in a City park" where plaintiff was "the owner of a home in the neighborhood adjacent to the park"); *McQueen*, 290 S.W.2d at 578 (finding no special injury were plaintiffs alleged that a fence erected on a street adjacent to their property "interfered with their right of free and unobstructed use of such street and caused their property to diminish in value"); *San Antonio Conservation Soc. v. City of San Antonio*, 250 S.W.2d 259, 264 (Tex. App.—Austin 1952, writ ref'd) (noting, where plaintiffs sought to enjoin construction and use of a bridge across the San Antonio River, that "[p]roximity to the river and parks along its banks does not determine the character of appellants' interests as being justiciable or not").

Considering all of the evidence in the record, we conclude that the trial court did not err in implicitly determining that TASI lacked standing to bring its public nuisance claim. TASI's first two issues are overruled.[9]

---

[9] TASI also argues by its first two issues that: (1) DDR did not object to the submission of Question

22

**B.      Exclusion of Expert Testimony**

By its third and fourth issues, TASI argues the trial court erred by excluding the testimony of their expert witnesses Keith Fairchild and Jerry Arredondo. As noted, TASI offered the testimony of Fairchild, a professor specializing in business valuation, to support its claim that it suffered pecuniary harm as a result of the nuisance on DDR's property. It offered the testimony of Arredondo, a licensed real estate broker and consultant, as an expert on, among other things: (1) how he assisted TASI in obtaining a certificate of occupancy; (2) whether certificates of occupancy were properly issued for DDR's facilities; and (3) how he was involved with the city council in the promulgation of Chapter 16 of the Municipal Code. Fairchild conceded on voir dire that his estimates were based on an assumption that, if the City properly enforced the ordinance, DDR's facilities would have been shut down and TASI would have obtained all of DDR's business. The trial court sustained DDR's objection to Fairchild's testimony on grounds that it was speculative. The trial court declined to designate Arredondo as an expert witness but permitted him to testify as a fact witness regarding his experience as a consultant for TASI.

On appeal, TASI argues that the trial court erred by disallowing Fairchild's testimony and restricting Arredondo's testimony. It contends, entirely within the discussion of its issues regarding the directed verdict and JNOV, that these witnesses would have provided additional evidence that it sustained special injury to its business

---

No. 3 of the jury charge, asking whether DDR's facilities were public nuisances as defined in the Municipal Code; and (2) TASI sought injunctive as well as declaratory relief. These points appear intended to address the argument made in DDR's motion for JNOV that Question No. 3 should be disregarded because it is immaterial. Because of our conclusion that TASI lacked standing to bring its public nuisance claim, we need not address these arguments. *See* TEX. R. APP. P. 47.1.

interests as a result of the alleged nuisance. Specifically as to Fairchild, TASI argues:

> [I]n the event this Court were to require TASI to present financial evidence, TASI attempted to introduce such evidence. TASI offered Dr. Keith Fairchild—a professor and PhD in Finance—to provide his expert financial analysis of Ramirez's and TASI's operations. Dr. Fairchild was prepared to testify regarding the net revenues both generated. The Trial Court would not permit the expert financial information to be offered, determining it was not relevant. If this Court requires such data, TASI respectfully urges that this Court reverse the Trial Court's Judgment and remand this case to be retried, allowing Dr. Fairchild to provide the financial data.

(Citations and record references omitted.) As to Arredondo, TASI argues:

> TASI also attempted to present additional evidence of the harm to its business interest by the expert testimony of Jerry Arredondo. Mr. Arredondo had years of experience handling projects with recycling operators, from initiating the business through continued compliance with City ordinances. He was intimately involved in the creation of Chapter 16 and efforts to improve the industry. The Trial Court declined to allow Mr. Arredondo to offer his expert testimony essentially concluding it would not be relevant or somehow believable. This ruling was clearly wrong as Mr. Arredondo could have provided the jury and judge an even deeper understanding of the industry, the competition between Ramirez and TASI, the effect on the industry of Ramirez's misconduct and the need to improve and protect the industry. All of these topics would have been relevant and crucial if this Court were to find TASI required additional evidence of harm to business interest. In that event, TASI respectfully urges this Court reverse the Trial Court's erroneous order limiting Mr. Arredondo's testimony and reverse this case for a new trial.

(Citations and record references omitted.)

DDR argues that TASI failed to adequately brief these issues. *See* Tex. R. App. P. 38.1(i). We agree. TASI cites two cases in support of its argument regarding exclusion of the expert witnesses—*Nabors Well Services, Ltd. v. Romero*, 508 S.W.3d 512, 545 (Tex. App.—El Paso 2016, pet. denied) and *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008)—however, it does not describe what tenets of law these cases stand for, nor does it apply any such tenets to the facts of this case. With respect to Fairchild, TASI does not provide any legal argument as to why the trial court erred in

excluding his testimony. Further, beyond stating that the witnesses would provide testimony regarding harm to TASI's business interests, TASI does not provide specific record references to explain how the trial court's rulings caused the rendition of an improper judgment or prevented the case from being properly presented on appeal. *See* TEX. R. APP. P. 44.1(a).

For the foregoing reasons, we overrule TASI's third and fourth issues.

## C. Private Nuisance

By its fifth issue, TASI argues "in the alternative" that the jury's rejection of its private nuisance claim was contrary to the great weight and preponderance of the evidence; that is, it claims the evidence was factually insufficient to support the jury's finding. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) ("When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence.").

The four elements of a private nuisance claim are: (1) the plaintiff had an interest in the land; (2) the defendant interfered with or invaded the plaintiff's interest by conduct that was negligent, intentional, or abnormal and out of place in its surroundings; (3) the defendant's conduct resulted in a condition that substantially interfered with the plaintiff's use and enjoyment of his land; and (4) the nuisance caused injury to the plaintiff. *Barnes*, 353 S.W.3d at 763; *City of Tyler v. Likes*, 962 S.W.2d 489, 503–04 (Tex. 1997); *Cerny v. Marathon Oil Corp.*, 480 S.W.3d 612, 622 (Tex. App.—San Antonio 2015, pet. denied). "A person is subject to liability for an intentional invasion when his conduct is unreasonable under the circumstances of the particular case." *Jamail*, 970 S.W.2d at 676.

In support of this issue, TASI relies on the same evidence it cited in its argument regarding standing, and it argues that the only countervailing evidence was Ramirez's own testimony. However, similar to the special injury requirement in the public nuisance context, a plaintiff has standing to enjoin a private nuisance only if it has sustained a "concrete and particularized" injury as a result thereof. *Schmitz*, 550 S.W.3d at 361; *S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 307 (Tex. 2007) ("[A]s a general rule, to have standing an individual must demonstrate a particularized interest in a conflict distinct from that sustained by the public at large."). We have already concluded that the trial court did not err in implicitly determining, by its directed verdict and JNOV rulings, that TASI did not suffer special injury as a result of DDR's operations. For the same reasons, we conclude that TASI did not sustain a "concrete and particularized" injury as a result of DDR's operations; therefore, it lacked standing to bring its private nuisance claim. *See Schmitz*, 550 S.W.3d at 361. TASI's fifth issue is overruled.

### III.    CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS
Chief Justice

Delivered and filed on the
14th day of October, 2021.